[No. B142127. Second Dist., Div. Three. Nov. 28, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERTO V., Defendant and Appellant.

**COUNSEL**

Randy Short, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Steven D. Matthews and Paul M. Roadarmel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ALDRICH, J.**—A jury convicted appellant Roberto V. of eight counts of committing lewd acts upon his two young daughters, three-year-old Maria

and seven-year-old Stephanie. Maria, who was four years old at the time of trial, did not testify. Over appellant's objection, the trial court admitted the girls' mother's testimony about Maria's out-of-court statements pursuant to Evidence Code section 1360. That section creates a hearsay exception for statements made by certain child victims of abuse or neglect, provided that various requirements are met. Among other things, if the child does not testify at the proceeding, the statement is admissible only if he or she is unavailable as a witness. Additionally, the proponent of the evidence must inform the adverse party of his or her intention to admit the child's statement sufficiently in advance of the proceeding to provide a fair opportunity to prepare to defend against it.

We conclude that, because neither the notice nor the unavailability requirement was met, the challenged hearsay statements were not properly admitted pursuant to Evidence Code section 1360. Moreover, because there was an insufficient showing that the statements were reliable, their admission violated appellant's rights under the confrontation clause of the United States Constitution, requiring reversal.

#### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

 a. *Prosecution's case.*

Martina D. and appellant had two daughters, Stephanie, seven, and Maria, three. Martina and appellant had lived together at various times for 10 years. When the alleged molestations occurred, appellant and Martina had been living separately for approximately a year and a half. Appellant lived in a converted garage he rented from Mirta Sagrero. Sagrero and her family lived in a house in front of the garage.

 (i) *June 1999 incidents and investigation.*

In June 1999, Martina wished to visit her father, who was ill. Appellant agreed to babysit the two girls at Martina's apartment. Martina left the girls in his care on the evening of Wednesday, June 16, and returned at approximately midnight on Thursday, June 17.

A day or two later,[1] Martina saw three-year-old Maria inappropriately kissing a toy and attempting to insert it into her vagina. Martina asked Maria

---

[1]Martina's testimony was unclear regarding the date Maria's behavior occurred. Martina testified she returned from her trip at approximately midnight on Thursday, June 17. How-

what she was doing. Martina understood from Maria's answer that Maria was playing, and wished her to play along. Maria told her mother to lie on the bed. Maria sat on top of Martina's pelvic area, moved in a manner that simulated sexual intercourse, and attempted to kiss Martina on the mouth. Martina asked Maria who had taught her to play that way. Maria said "ella ["she" in Spanish] and Poppy." Martina asked who "ella" was, and Maria pointed to a picture of Stephanie. Martina also stated that Maria had placed her prone on the bed and said "Poppy would get in that position."

On one or two other occasions thereafter, Maria attempted similar conduct, including attempting to disrobe Martina, kiss her, and touch her. During those incidents, Maria stated that she wanted to "play like Daddy plays."

After witnessing Maria's conduct with the toy and questioning her, Martina questioned Stephanie. Stephanie initially said Maria was lying, but then stated she did not wish to explain because she did not want her father to go to jail. After Martina promised she would not harm appellant, Stephanie admitted appellant had molested her. Stephanie told her mother that she had bled when appellant had molested her, asked Martina to check her genital area, and showed Martina a pair of panties that she said appellant had repeatedly washed. Martina examined the panties and saw only urine stains. Martina initially did not believe Stephanie because the children had never showed any fear of appellant and liked to spend time with him.

On June 22, 1999, Martina took both girls to a hospital for a sexual assault examination by Dr. Scott Oslund. Maria's examination was normal. There was no evidence of anal or vaginal penetration or trauma, her hymen was intact, and there were no bruises on her body. Had digital penetration of Maria's vagina occurred, Dr. Oslund would have expected to see damage or irritation. Stephanie's examination likewise disclosed no bleeding, irritation, scarring, vaginal or anal trauma, or other injuries. However, her hymen was completely absent. Other than the missing hymen, there was no evidence of vaginal penetration. Dr. Oslund would have expected to find a completely intact hymen in a girl Stephanie's age, and there was a high medical probability that Stephanie had been born with one. A girl's hymen could be lost through sexual penetration or through accidental trauma, such as falling from a boys bicycle and hitting the vaginal area. Dr. Oslund had conducted between 30 and 40 sexual assault examinations on children; it was uncommon to find physical evidence of molestation during such examinations. Dr.

---

ever, she stated that Maria's conduct with the toy occurred "a day and a few hours" after she returned from her trip, and also that "it was the first Monday after I came back from visiting my father."

Oslund opined that Stephanie was "way too comfortable" with the examination procedure.

Detective Sonia Ayestas interviewed Stephanie at her elementary school. After describing the acts of molestation, Stephanie wrote a note to her father expressing sorrow that he was in jail, and stating that she loved him and her mother, sister, and brother.

> (ii) *Stephanie's account of the 1999 molestations at Martina's apartment.*

Stephanie, who was eight years old at the time of trial, testified as follows. While Martina was visiting her father, appellant sexually molested both girls. The girls were watching a movie in the living room of Martina's apartment. Appellant and Maria went into the bedroom. Stephanie heard noises coming from the room. She took a knife from the kitchen, and picked the lock on the door.[2] When she entered the room, she observed her father and sister, completely disrobed. Appellant was lying on his stomach and Maria was lying on top of him. Stephanie entered the room, hid underneath the bed, and played with a toy she found beneath the bed for 15 minutes. She knew 15 minutes had elapsed because she kept track of the time on her gold watch. It was "about 1:00" when she went under the bed.

When Stephanie emerged from under the bed, five more minutes elapsed, and then she observed her father and sister "doing S-E-X." Using language appropriate for a child her age,[3] Stephanie explained that she saw appellant kiss Maria on the mouth, orally copulate her, digitally penetrate her anus, engage in intercourse with her, and clean her genital area with tissue. Appellant held Maria's buttocks, and made noises. He and Maria were moving "like shaky." Stephanie described appellant's penis as looking "kind of like a little rat." He was "sticking it on" Maria and putting it inside Maria's "private part" a "little bit," approximately one inch.

Maria eventually saw Stephanie in the room and told appellant. When appellant realized Stephanie was present, he asked her how long she had been there and called her a foul name. Stephanie dressed Maria and Maria returned to the living room.

Appellant told Stephanie to remove her clothing and lie on top of him. Stephanie protested "that's bad to do" and that "I know what you're telling

---

[2]Stephanie explained that she had opened the door using a knife more than 20 times. Martina testified that the bedroom door could be opened with a knife and that Stephanie had learned how to do so.

[3]Stephanie referred to the vaginal area as the "choncha," the penis as the "wiwi," and the buttocks as the "butt." She also illustrated the molestations using anatomically correct dolls.

me to do . . . that's the same thing that . . . you were doing when I was a little girl." Appellant held Stephanie very hard, kissed her on the mouth, orally copulated her, engaged in sexual intercourse with her, and cleaned her with tissue. During the incident, appellant's penis was "soft." Approximately one and one-fourth inches of his penis penetrated her "private part."

On cross-examination, Stephanie testified that no molestation occurred the first night Martina left on her trip.

Stephanie saw "yellow blood" in her genital area and on her underwear the day after the molestation occurred. She did not see any "red blood" after the incident.

### (iii) *Molestations at the garage apartment.*

Stephanie testified that the next day, in the afternoon, appellant took both girls to his garage apartment and molested them. Appellant, who was naked, removed Stephanie's clothing, lay on the bed with her, "sticked his private part" on hers, and cleaned her with tissue. His penis was "soft." Initially, Stephanie testified that appellant penetrated her vagina "a little bit." After a break in testimony, she testified that vaginal penetration did not occur, but that appellant digitally penetrated her anus and orally copulated her. At that point, Stephanie's cousins knocked on the door. The cousins did not live at Sagrero's house. Stephanie went outside to play with them.

Stephanie heard a noise in the garage and looked in the garage window. She observed appellant orally copulating Maria. In order to see into the garage window, Stephanie had to climb approximately nine stairs. She then fell from the stairs into a sandbox. She and her friends had been making a sand castle and she destroyed it by falling down. She got muddy sand on her face and went to the house next to the garage to wash.

Stephanie stated both that she did not recall opening the door to the garage apartment with a knife, and that she thought she had opened the garage apartment door with a knife.

According to Stephanie, appellant had taken the girls to Knott's Berry Farm and a movie while Martina was away on her trip.

Appellant told her not to tell anyone about the molestations or he would not buy her anything, and that he would kill her mother. Stephanie did not want to tell because if appellant was in jail, he could not take her places on Saturdays and Sundays.

Stephanie confirmed that she was telling the truth, and that her mother had not told her what to say. She believed God would punish liars.

(iv) *Stephanie's other behavior and suspicion of molestation in 1996.*

Martina testified that in 1996, when Stephanie was three years old, Martina discovered Stephanie and a three-year-old boy simulating sexual behavior. Stephanie was bent over; the young boy had his pants down and was attempting to place his penis between her buttocks. Stephanie was examined by medical personnel and interviewed by a social worker. She refused to tell a nurse where she had learned the behavior, stating that her "father was going to be mad." An investigation into possible sexual abuse was closed as unsubstantiated for lack of evidence. Subsequently, Stephanie had instigated episodes "at three different schools" in which she inappropriately kissed other girls.

The prosecutor asked Stephanie whether appellant had molested her in the past. Stephanie replied that he had done so when she was "a little girl." Stephanie did not remember what appellant had done, but she thought "it was the same thing" as in the 1999 incidents. When asked how she knew appellant had previously molested her, Stephanie replied, "[b]ecause . . . I remembered but now I don't." Stephanie remembered the earlier incident occurred after her mother confronted her about Maria's sexual behavior.

Stephanie also testified that, while she was certain appellant had engaged in sexual conduct with her before the 1999 incidents, "[s]ome other kids did it too." On cross-examination, she described an incident in which one or two young boys had tied her hands, placed tape over her mouth, and raped or attempted to rape her. Initially she stated that the boy or boys placed their private parts in hers. On redirect she stated that the boy placed his "front private part" on "[her] front private part" and "went up and down." She initially testified that she had seen the boy's genitalia, but eventually testified to the contrary and denied that he had "put his wiwi inside [her] choncha."

Stephanie's cousin had also attempted sexual activity with her, but she "socked him." He "locked [her] in a locker he had at [the] swimming pool" and threatened to drop her into the pool. Stephanie had seen people having sex when watching "novellas" (soap operas).

Stephanie testified that, when she was five years old, she had fallen from her brother's bicycle, causing a cut near her genital area, that bled "red

blood." Martina denied that Stephanie had ever fallen off a bicycle and injured her vaginal area.

### b. *Defense case.*

#### (i) *Stephanie's statements to an investigating social worker and detective.*

Investigating Detective Sonia Ayestas and social worker Elsie Rivera both testified regarding Stephanie's statements to them. Stephanie had told Rivera that the molestations occurred on a Saturday and Sunday.[4] She told Ayestas that the second molestation occurred on Saturday. Stephanie told Rivera that appellant's penis was "hard," rather than flaccid, when he molested her, and that he had been clothed, rather than naked, during the molestation. Stephanie had told Ayestas that the molestations at Martina's apartment occurred on the living room sofa, rather than in the bedroom. Stephanie did not tell Ayestas that she had opened Martina's apartment bedroom door with a knife, had hidden beneath the bed, or had fallen from stairs into a sandbox at the garage apartment. Stephanie did, however, inform Ayestas that while at the garage apartment, she had obtained a knife from a house at the front of the garage (apparently Sagrero's house) and opened the locked garage door with it.

#### (ii) *Mirta Sagrero's testimony.*

Sagrero, appellant's coworker and landlady, testified as follows. Sagrero and her five children lived in a house in front of the garage apartment. Appellant, Stephanie, and Maria came to the property on Wednesday, June 16 (the night Martina left on her trip). Appellant went to the garage apartment while Stephanie and Maria played with Sagrero's children in Sagrero's daughter's bedroom. Appellant and the girls stayed for approximately 20 to 30 minutes. Sagrero was unsure whether Stephanie or Maria had entered appellant's apartment at that time, but they had played with her daughters for most of the time appellant was there. The next day, Thursday, Sagrero saw appellant at work from 5:00 a.m. until approximately 3:30 in the afternoon. Sagrero did not see appellant, Stephanie or Maria at the garage apartment on Thursday.

Sagrero did not see Stephanie retrieve a knife from the Sagrero home. She opined that an adult could "probably" open the garage door with a knife using "a lot of effort, because there [was] a piece of wood that would have

---

[4]As noted, Martina had testified that she left to visit her father on a Wednesday night and returned the following Thursday night at approximately midnight.

to be broken to be able to fit a knife in." There were no stairs leading to the garage windows (although there was a children's slide with a ladder somewhere in the yard). There had not been a sandbox at the property in June of 1999.

Approximately one week after appellant was arrested, Martina came to appellant's garage apartment and attempted entry. Martina falsely accused Sagrero of having an affair with appellant.[5] Martina told Sagrero she "wasn't going to have [appellant] any more because he was already in the place where she wanted him to be for a long time." Sagrero called police, who allowed Martina to remove a TV, VCR and a bicycle from appellant's apartment. Martina subsequently telephoned Sagrero several times and insulted her. Sagrero and her coworkers had initially attempted to raise bail money for appellant and retain private counsel for him, but ceased their efforts upon learning the cost was prohibitive.

### (iii) *Testimony regarding custody of the children.*

Lidia Bermudez, who knew both Martina and appellant, testified that in June 1999, appellant had talked to her regarding the custody of his children. Shortly before the allegations of molestation surfaced, Bermudez told Martina she should "wise up because [appellant] wanted to take the custody of the children away from her."

### (iv) *Appellant's denials.*

Appellant denied any sexual conduct with either child at any time. On the night Martina left, he and the girls followed Martina's bus for several blocks. They then went to the Sagrero property, where appellant obtained a change of clothes from his garage apartment; the girls did not enter his apartment. He then took the girls to Martina's apartment, where he put them to bed on blankets on the floor; he slept in the bed.

Appellant did not take the girls to Knott's Berry Farm or a movie while Martina was gone. Appellant, Martina, and both girls had visited Knott's Berry Farm earlier in the year. There was no sandbox at the garage apartment and no stairs lead to the window. Martina, however, testified that there was "something [with] sand in it to play" in Sagrero's yard when she visited there approximately a week and one half after her trip.

Appellant believed Martina was neglecting the children and had been considering attempting to obtain custody. Approximately one and one-half

---

[5]Both Sagrero and appellant denied having an affair.

weeks before his arrest, he discussed his wish to obtain custody with a woman (apparently Bermudez, although the record is not clear). Appellant and Martina had argued shortly before his arrest. Martina admitted on cross-examination that when she returned from visiting her father, appellant had made her angry and had "humiliated" her.

Sagrero had visited appellant five or six times while he was in jail, and they had spoken on the phone six or seven times.

(v) *Defense medical expert's testimony.*

Dr. Ronald Miller, a board-certified obstetrician/gynecologist, testified as an expert for the defense, as follows. Before puberty, a girl's vagina is small, fragile, and lacks elasticity. Injuries, falling, self-penetration, and sexual activity could damage the hymen. Due to the size and delicate structure of a child's vagina, if an adult penetrated a three-year-old's or an eight-year-old's vagina with his penis, injury such as scarring or tearing would likely have occurred. The fact Stephanie's hymen was totally absent showed she was probably born without one, as is the case in approximately 1 to 2 percent of the population. He conceded that the rubbing of a flaccid penis against a child's genitalia would likely cause no injury.

2. *Procedure.*

Trial was by jury. Appellant was convicted of two counts of committing lewd acts upon Maria and six counts of committing lewd acts upon Stephanie, both children under the age of 14 years (Pen. Code, § 288, subd. (a)). The jury also found true allegations that appellant had engaged in substantial sexual conduct with Stephanie and Maria (Pen. Code, § 1203.066, subd. (a)(8)). The trial court sentenced appellant to a term of 16 years in prison. Appellant appeals.

DISCUSSION

1. *Admission of Martina's testimony about Maria's out-of-court statements was error, as the prerequisites of Evidence Code section 1360 were not met.*

a. *Factual background.*

Jury selection concluded and the panel was sworn on Friday, February 18, 2000. Monday, February 21 was a court holiday. On Tuesday, February 22, 2000, the prosecutor informed the court and defense counsel that he intended

to offer Martina's testimony that Maria had engaged in sexual behavior with the toy, had mimicked sexual behavior with Martina, and had identified "ella [Stephanie] and Poppy" as the source of the behavior. The prosecutor explained he had not learned of the evidence until he had spoken with Martina the preceding Friday afternoon, February 18, 2000.

Defense counsel opined that Martina's disclosure of the evidence on the eve of trial was "very suspicious." He objected and moved to exclude the evidence on the grounds the "ella and Poppy" statement was hearsay, the People had violated the discovery requirements of Penal Code section 1054,[6] and the evidence was more prejudicial than probative under Evidence Code section 352.

The prosecutor proposed to offer Maria's statement for the nonhearsay purpose of explaining why Martina had questioned Stephanie. The court expressed concern that the jury would rely on the statement as evidence that appellant actually molested Maria and suggested the prosecutor could guide Martina through the chronology of events with a leading question. The court reserved ruling on the admissibility of Martina's testimony about Maria's statement.

On Thursday, February 24, 2000, during his direct examination of Martina, the prosecutor renewed his request to question her regarding Maria's statement, on the same theory that Maria's out-of-court statement was admissible for the nonhearsay purpose of explaining Martina's conduct. The court again directed the prosecutor to ask Martina a leading question to guide her through the chronology of events and to avoid questioning her regarding Maria's statement.

Martina continued to testify. Trial was adjourned for the noon recess. Immediately thereafter, the prosecutor renewed his request to admit Martina's testimony, explaining that, "over lunch," he had discovered Evidence Code section 1360 and sought admission of the evidence pursuant to that section. The court and the parties addressed whether the requirements of section 1360 had been met. The trial court opined that the lack of a "hard and fast" notice requirement in section 1360 indicated it was required to make an independent determination of whether there was sufficient notice

---

[6] On appeal, appellant makes only a brief, conclusory allegation that the evidence was admitted without proper discovery under Penal Code section 1054. Appellant fails to provide any substantial argument or citation to authority to support his contention. To the extent appellant intends to assert a claim of error under section 1054, his failure to argue the matter and cite authority constitutes a waiver of the point on appeal. (*People v. Gray* (1998) 66 Cal.App.4th 973, 994 [78 Cal.Rptr.2d 191]; *People v. King* (1991) 1 Cal.App.4th 288, 297, fn. 12 [2 Cal.Rptr.2d 197].)

under the circumstances. The court ordered that the prosecution make available to the defense two investigating officers who had interviewed Martina, as well as social worker Rivera, so defense counsel could attempt to establish that Martina had not disclosed Maria's statement earlier. Upon learning that one of the officers was on vacation, the court required that the prosecutor either produce the officer or stipulate that Martina failed to mention Maria's statement when interviewed.[7] Over defense counsel's objection, the trial court ruled Martina's testimony about Maria's statement was admissible pursuant to section 1360.

 b. *Martina's testimony about Maria's statements was not properly offered for the nonhearsay purposes advanced by the People.*

 ■ As offered here, Maria's statements were hearsay. After witnessing Maria's sexual conduct, Martina asked who had taught her such behavior. Maria replied that "ella" and "Poppy" had done so. On other occasions, Maria attempted similar sexual conduct and stated she wanted to "play like Daddy played."[8] Maria's statements to her mother, understood in context, amounted to representations that appellant had molested her. Martina's testimony about Maria's statements was thus "evidence of a statement . . . made other than by a witness while testifying at the hearing" and was "offered to prove the truth of the matter stated." (Evid. Code, § 1200.) In short, Martina's testimony about Maria's statements was hearsay.[9]

---

[7] For reasons that do not appear in the record, defense counsel did not attempt to introduce the stipulation or elicit evidence from Ayestas or Rivera that Martina had not informed them of Maria's conduct and statements earlier.

[8] We note that below and on appeal, the parties primarily address admission of the "ella and Poppy" statement. Below, defense counsel made no objection to Martina's testimony that Maria also said she wished to "play like Daddy played" and said "Poppy would get in that position." This testimony was elicited after the court ruled the "ella and Poppy" statement admissible, and thus defense counsel reasonably could have assumed any objection to the additional statements would have been futile. (*People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1433, fn. 1 [105 Cal.Rptr.2d 504] [argument or objection not required to preserve point when it would have been futile]; *People v. Mikhail* (1993) 13 Cal.App.4th 846, 852-853 [16 Cal.Rptr.2d 641] [same].) Accordingly, we consider whether admission of all the statements was proper under Evidence Code section 1360.

[9] Appellant contends that Maria's sexual behavior was equivalent to an out-of-court declaration that Maria had learned sexual behavior, and thus should have been excluded as hearsay under Evidence Code section 225. We find this contention specious. Section 225 defines a "statement" as, inter alia, "nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression." Three-year-old Maria's conduct cannot fairly be characterized as intended by her to substitute for oral or written expression. (*In re Dorinda A.* (1992) 10 Cal.App.4th 1657, 1663 [13 Cal.Rptr.2d 653] [nonverbal conduct qualifies as statement for purposes of § 225 only if conduct was intended by declarant as substitute for oral or written verbal expression].) The record suggests Maria believed she was playing a game, not attempting to nonverbally communicate. Appellant cites no authority or argument persuading

We reject the People's argument that Maria's statements were properly admitted because they were offered for nonhearsay purposes. First, the People urge Maria's statements were offered for the nonhearsay purpose of explaining Maria's state of mind. The People rely upon two dependency cases (*In re Kailee B.* (1993) 18 Cal.App.4th 719, 727 [22 Cal.Rptr.2d 485]; *In re Dorinda A., supra,* 10 Cal.App.4th at pp. 1662-1663), in support. *Dorinda A.* reasoned that, in a dependency proceeding, a minor's out-of-court statement that her father had molested her could be admissible not for the truth of the statement, but to show the minor was afraid of her father and believed he had harmed her. (*In re Dorinda A., supra,* at pp. 1662-1663.) *Dorinda A.* pointed out, " '[t]he purpose of a dependency hearing is to determine the best interests of the child and to protect those interests. [Citations.] A child's belief that her father harmed her and her fear of him is relevant evidence tending to prove it is not in the child's best interests to permit his continued contact with her.' " (*Id.* at p. 1663; *In re Kailee B., supra,* at pp. 726-727.) However, the instant matter was a criminal trial, not a dependency proceeding; the jury was considering appellant's guilt, not whether future contact with appellant was in Maria's best interests. (E.g., *In re Cindy L.* (1997) 17 Cal.4th 15, 30 [69 Cal.Rptr.2d 803, 947 P.2d 1340] [rights and interests at stake in dependency proceedings are different than those in a criminal case; dependency proceedings do not result in criminal sanctions and exist to further the best interests of the child].) In the context of this criminal proceeding, Maria's belief that appellant had molested her was relevant only if true.

The People further urge that Martina's recitation of Maria's statement that Stephanie and "Poppy" had taught her sexual behavior was properly advanced for the nonhearsay purpose of explaining Martina's conduct, i.e., to explain why Martina approached Stephanie after speaking with Maria. The People are of course correct that a statement is not hearsay unless offered for the truth of the matter asserted. (Evid. Code, § 1200; *People v. Riel* (2000) 22 Cal.4th 1153, 1190 [96 Cal.Rptr.2d 1, 998 P.2d 969].) However, the trial court rejected the prosecutor's attempts to admit Maria's statement on the theory that it explained Martina's actions. The court noted the prosecutor could easily elicit the chronology of events by asking Martina a leading question, and expressed concern that "the jury . . . is going to use it [the statement] to help you prove the allegations that he did this to her. They are going to use it." Thus, the trial court impliedly found that the probative value of the testimony was outweighed by its prejudicial effect. (Evid. Code, § 352.) ■ A trial court has wide discretion when determining whether Evidence Code section 352 precludes the admission of evidence, and its

us otherwise. Thus, Martina's testimony regarding Maria's conduct was not barred by the hearsay rule.

exercise of discretion will be disturbed on appeal only if the court's decision exceeded the bounds of reason. (*People v. Mobley* (1999) 72 Cal.App.4th 761, 792-793 [85 Cal.Rptr.2d 474].) ▪ Here, the trial court was correct that Maria's statement possessed very little probative value apart from its truth. (Cf. *In re Clara B.* (1993) 20 Cal.App.4th 988, 998-999 [25 Cal.Rptr.2d 56].) In any event, Maria's statements were ultimately admitted for their truth, not for a nonhearsay purpose. We cannot now find the statements were properly admitted for a nonhearsay purpose.

 c. *Evidence Code section 1360.*

▪ We next consider whether the requirements of Evidence Code section 1360 were met. Section 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse. (Evid. Code, § 1360; *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1327 [72 Cal.Rptr.2d 154].) Section 1360 safeguards the reliability of a child's hearsay statements by requiring that: (1) the court find, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances surrounding the statement(s) provide sufficient indicia of reliability; (2) the child either testifies at the proceedings, or, if the child is unavailable to testify, other evidence corroborates the out-of-court statements; and (3) the proponent of the statement gives notice to the adverse party sufficiently in advance of the proceeding to provide him or her with a fair opportunity to defend against the statement.[10] (Evid. Code, § 1360; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 444-445 [107 Cal.Rptr.2d 440]; *People v. Brodit, supra,* 61 Cal.App.4th at p. 1329; cf. *In re Cindy L., supra,* 17 Cal.4th at p. 29.) ▪ We review a trial court's admission of evidence under section 1360 for abuse of discretion. (*People v. Brodit, supra,* at p. 1330.)

---

[10]Evidence Code section 1360 provides: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if *all* of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child. [¶] (b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement. [¶] (c) For purposes of this section, 'child abuse' means an act proscribed by Section 273a, 273d, or 288.5 of the Penal Code, or any of the acts described in Section 11165.1 of the Penal Code, and 'child neglect' means any of the acts described in Section 11165.2 of the Penal Code." (Italics added.)

▮ Appellant does not challenge, and we therefore do not address, the first requirement, that the trial court conduct a hearing outside the presence of the jury and determine that the time, content, and circumstances surrounding the statements provide sufficient indicia of reliability. Appellant does, however, urge that the unavailability and notice requirements mandated by Evidence Code section 1360 were not met. We agree.

(i) *The trial court abused its discretion by finding Maria was unavailable as a witness without conducting a hearing regarding her competence.*

As noted, Evidence Code section 1360, subdivision (a)(3) requires, as a prerequisite to admission of a child's out-of-court statements, that the declarant child either testify at the proceedings or "[i]s unavailable as a witness . . . ." Here, the trial court found the unavailability requirement was met because a witness is considered unavailable if he or she is unable to qualify as a witness, and "[t]hat would certainly cover a four-year-old under most circumstances." The court did not conduct an evidentiary hearing to determine Maria's competence. Appellant urges this was error, in that "[t]he court's factual presumption about a four year old not qualifying as a witness is not necessarily true."

▮ In general, every person, irrespective of age, is qualified to be a witness. (Evid. Code, § 700; *People v. Dennis* (1998) 17 Cal.4th 468, 525 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) A witness is disqualified from testifying only if he or she is incapable of expressing him or herself so as to be understood, or is incapable of understanding the duty of a witness to tell the truth. (Evid. Code, § 701, subd. (a); *People v. Anderson* (2001) 25 Cal.4th 543, 572-573 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Mincey* (1992) 2 Cal.4th 408, 444 [6 Cal.Rptr.2d 822, 827 P.2d 388].) The party challenging the witness bears the burden of establishing lack of competence. (*People v. Anderson, supra,* at p. 573; *People v. Dennis, supra,* at p. 525.) Whether a witness has the capacity to communicate and an understanding of the duty to testify truthfully is a preliminary fact to be determined exclusively by the trial court, whose determination will be upheld absent a clear abuse of discretion. (*People v. Anderson, supra,* at p. 573.) ▮ A witness who is disqualified from testifying is unavailable for purposes of Evidence Code section 1360. (Evid. Code, § 240, subd. (a)(2).)

Maria was approximately four years and three months old at the time of trial. It is not unheard of for a four year old to qualify as a witness. (E.g., *In re Katrina L.* (1988) 200 Cal.App.3d 1288, 1292 & fn. 1, 1299 [247 Cal.Rptr. 754] [rejecting argument that four-year-old witness was incompetent].) It is not unusual for five year olds to qualify as witnesses. (*People v.*

*Mincey, supra,* 2 Cal.4th at pp. 443-445 [trial court did not abuse its discretion by finding five-year-old witness competent to testify]; *Adamson v. Department of Social Services* (1988) 207 Cal.App.3d 14, 19-20 [254 Cal.Rptr. 667] [same]; *People v. Thompson* (1959) 167 Cal.App.2d 727, 735 [335 P.2d 249] [no error to find five year old competent where she was exceptionally bright for age]; *People v. Smith* (1958) 162 Cal.App.2d 66, 67, 69 [327 P.2d 594].) Martina stated that Maria spoke "well" at the time of trial. The fact a social worker and a detective had been unable to interview Maria months earlier because she was shy, unfocused, and inarticulate did not bear on Maria's competence *at the time of trial.* Thus, we conclude the trial court erred by simply assuming Maria was incompetent without conducting a hearing to determine her competency. (*Bradburn v. Peacock* (1955) 135 Cal.App.2d 161, 163-164 [286 P.2d 972] [trial court erred by ruling five-year-old child was incompetent to testify without conducting voir dire examination to determine the child's competence; " 'extreme youthfulness was not, *per se,* sufficient to exclude him from the witness-stand. There is no arbitrary age limit under which the testimony of a child is automatically rejected.' [Citation.]"].)

While we agree with the trial court that most four year olds would have difficulty qualifying as witnesses, this is not a foregone conclusion. Testimonial competence may vary greatly given an individual child's abilities. Some four-year-old children are precocious and verbal, while many have limited language and cognitive abilities. Whether a child is competent to testify may also depend upon the nature of the testimony sought to be elicited. While a young child may have difficulty expressing complex or abstract thoughts, such a child may well be able to relate uncomplicated, simple facts.[11]

 (ii) *The People failed to provide appellant with the notice required by Evidence Code section 1360, subdivision (b).*

■ We also agree with appellant that Martina's testimony about Maria's statements was improperly admitted because the prosecution failed to give the statutorily required notice. Evidence Code section 1360, subdivision (b) requires that, before a child's statement is admitted pursuant to that section, the proponent of the statement must make known to the adverse

---

[11]Evidence Code section 700 notwithstanding, we recognize that in the absence of highly unusual circumstances, as a practical matter children two years old or under will be incompetent to testify at trial, given that children of such tender years are generally unable to effectively communicate in the manner required in a courtroom. We assume that the parties normally stipulate to a child's incompetence in such cases, and we do not expect that they typically insist trial courts engage in the futile gesture of holding competence hearings for children so young.

party "the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement."

As noted, appellant's counsel was not informed of Maria's statement, or the prosecution's intent to introduce it, until Tuesday, February 22, 2000, after jury selection had concluded. The prosecutor did not inform the defense that he intended to offer the statement *pursuant to Evidence Code section 1360* until after Martina had begun testifying.

We conclude the notice given did not meet the requirements of Evidence Code section 1360. The statute mandates that notice must be given "sufficiently *in advance of the proceedings* . . . ." (§ 1360, subd. (b), italics added.) When construing a statute, we " 'must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citation.]" (*People v. Tindall* (2000) 24 Cal.4th 767, 772 [102 Cal.Rptr.2d 533, 14 P.3d 207].) ■ "In determining such intent, we begin with the language of the statute itself. [Citation.] That is, we look first to the words the Legislature used, giving them their usual and ordinary meaning. [Citation.] 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." ' [Citation.]" (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 192 [96 Cal.Rptr.2d 463, 999 P.2d 686].)

■ Evidence Code section 1360 does not provide a definition of "proceedings" as used therein.[12] ■ " 'The word "proceeding" necessarily has different meanings, according to the context and the subject to which it relates. . . .' " (*The Recorder v. Commission on Judicial Performance* (1999) 72 Cal.App.4th 258, 270 [85 Cal.Rptr.2d 56]; *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1105 [1 Cal.Rptr.2d 222].) "Narrowly, it means an action or remedy before a court. [Citations.] [¶] Broadly, it means 'All the steps or measures adopted in the prosecution or defense of an action.' " (*Zellerino v. Brown, supra,* at p. 1105; Black's Law Dict. (6th ed. 1990) p. 1204 [proceeding generally defined as, "the form and manner of conducting juridical business before a court or judicial officer"].)

■ Here, the relevant proceeding was appellant's trial. It cannot be seriously contended that "proceedings," as used in Evidence Code section

---

[12]Evidence Code section 901 defines "[p]roceeding" as "any action, hearing, investigation, inquest, or inquiry (whether conducted by a court, administrative agency, hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, pursuant to law, testimony can be compelled to be given." (§ 901; see also § 903 [defining criminal proceeding as a criminal action].) However, sections 901 and 903 are not directly controlling here, because section 900 provides that these definitions apply only to the construction of Division 8 of the Evidence Code, dealing with privileges; that division is not involved here.

1360, refers to the testimony of individual witnesses. Such an interpretation would make little sense given the statutory purpose to provide the party adverse to the hearsay statements with an opportunity to prepare to meet them.

Likewise, it is clear that Evidence Code section 1360 required the People to disclose their intent to offer the statement, as well as the particulars of the statement, *prior to* the time trial began. The usual and ordinary meaning of "in advance of" as used in section 1360, is "ahead of" or "before." (Webster's 3d New Internat. Dict. (1993) p. 30.) "[I]n advance of," as used in section 1360, cannot reasonably be interpreted to mean something other than *before* the proceedings commence. (*People v. Tindall, supra,* 24 Cal.4th at p. 772 [courts will not " ' "interpret away clear language in favor of an ambiguity that does not exist[.]' " ' [Citation.]"].) While the trial court was correct that it had discretion to determine whether the party adverse to the section 1360 evidence had a fair opportunity to prepare, that discretion may only be exercised when the proponent of the evidence gives the required notice *before* the proceedings begin. Had the Legislature intended that notice could be given during trial, it could have excluded the phrase "sufficiently in advance of the proceedings" and allowed the evidence to be admitted whenever the trial court concluded the adverse party had been given a fair chance to prepare. ▆ "It is a maxim of statutory construction that 'Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage.' [Citation.]." (*Reno v. Baird* (1998) 18 Cal.4th 640, 658 [76 Cal.Rptr.2d 499, 957 P.2d 1333].)

▆ The question of when a criminal trial commences depends upon the particular statutory provision at issue. (E.g., *People v. Rogers* (1995) 37 Cal.App.4th 1053, 1057, fn. 3 [44 Cal.Rptr.2d 107] [for double jeopardy purposes, criminal trial commences when the jury is sworn]; *People v. Granderson* (1998) 67 Cal.App.4th 703, 705, 707-709 [79 Cal.Rptr.2d 268] [for purposes of Pen. Code, § 1043, subd. (b)(2), which provides that noncapital felony trial can go forward if accused is voluntarily absent after trial commences, trial begins with jury selection]; *People v. Lewis* (2001) 25 Cal.4th 610, 629 [106 Cal.Rptr.2d 629, 22 P.3d 392] [for purposes of Pen. Code, § 1382's speedy trial requirement, defendant is " 'brought to trial' . . . when the court has 'committed its resources to the trial, and the parties must be ready to proceed and a panel of prospective jurors must be summoned and sworn[.]' "].)

Thus, to determine when a trial begins for purposes of Evidence Code section 1360, we must examine the language of the statute at issue, as well

as the policies underlying it. We conclude that, for purposes of section 1360, trial begins when the jury is sworn. The text of section 1360, subdivision (b) makes clear that the notice requirement was enacted to give a criminal defendant a fair opportunity to prepare his or her defense. Allowing the prosecution to disclose its intent to introduce such evidence after the jury has been sworn, when opening statements and the taking of evidence are imminent, would undermine this policy. As a practical matter, the parties need to know what evidence may be offered in order to make opening statements and to prepare for the examination of witnesses.

The circumstances here illustrate why allowing notice after trial has commenced can result in unfairness. The prosecutor did not divulge the particulars of Maria's statements until after the jury had been sworn. That afternoon, opening argument was heard and Stephanie began testifying. The prosecutor did not express his intention to offer the statements pursuant to Evidence Code section 1360 until midway through Martina's testimony. The prosecutor's previous attempts to introduce the statements for nonhearsay purposes had failed. Thus, defense counsel had no reason to believe Maria's statements would be admitted until the middle of Martina's testimony. At that point he had no time to prepare to cross-examine Martina on the relevant points, no time to conduct additional investigation, and little or no time to modify his conduct of the trial based upon the new evidence. While the trial court attempted to mitigate the prejudice by requiring the People to produce Ayestas and Rivera and to stipulate that Martina had not disclosed Maria's comments in an interview with another detective, these measures were insufficient.[13] For example, Stephanie had already testified and been excused, making it difficult for appellant to question her regarding Maria's newly introduced statement that Stephanie, as well as appellant, had showed Maria sexual behavior. Moreover, prior to trial, defense counsel had sought admission of information about the suspected 1996 molestation and Stephanie's sexual behavior. Appellant posits that had counsel received notice earlier, he might instead have withdrawn his request and should have

---

[13]Evidence Code section 1360 was modeled after Washington's child hearsay statute (Wash. Rev. Code Ann. § 9A.44.120 (1994)). (*In re Cindy L., supra,* 17 Cal.4th 15, 29.) The Washington statute, in turn, was derived from Federal Rules of Evidence rule 807 (28 U.S.C.), the federal "catch-all" hearsay exception (formerly rule 803(24)). (*State v. Ralph Vernon G.* (1998) 90 Wash.App. 16, 23 [950 P.2d 971, 974].) We observe that some courts and commentators have concluded, in construing those analogous provisions, that the failure to give sufficient notice may be harmless when the party adverse to the hearsay statement is not prejudiced in preparing to meet the statements. (E.g., *United States v. Brown* (9th Cir. 1985) 770 F.2d 768, 771; *U.S. v. Frazier* (E.D.Pa. 1986) 678 F.Supp. 499, 503; *State v. Hughes* (1989) 56 Wash.App. 172, 174-175 [783 P.2d 99, 100-101]; 5 Weinstein et al., Federal Evidence (2d ed. 2001) § 807.04[2], pp. 807-35 to 807-38.) We do not decide whether, on other facts, the failure to give notice prior to trial might be harmless if the defendant was not prejudiced in his or her ability to prepare to meet the statements.

moved to exclude this evidence under Evidence Code section 352. We cannot fairly speculate after the fact about what counsel might or might not have done differently had he known of the evidence and the prosecutor's intent to introduce it prior to trial.

Accordingly, we hold Evidence Code section 1360's notice requirement is not satisfied when notice of intent to introduce the statement pursuant to section 1360 and the particulars of the statement are given after the jury has been sworn.[14]

### 2. *The error violated appellant's confrontation clause rights.*

Having found error, we next consider whether it was prejudicial. If admission of the hearsay statements violated a state statute alone, we apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and reverse only if there is a reasonable probability of a result more favorable to the defendant in the absence of the error. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [101 Cal.Rptr.2d 701, 12 P.3d 1110] [*Watson* standard applicable to state law error in admission of hearsay].) If, on the other hand, the error violated appellant's confrontation clause rights, we must determine whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *Lilly v. Virginia* (1999) 527 U.S. 116, 139-140 [119 S.Ct. 1887, 1901-1902, 144 L.Ed.2d 117] [applying *Chapman* standard to violations of confrontation clause]; *People v. Sandoval, supra,* 87 Cal.App.4th at p. 1444.)

### a. *Confrontation clause analysis.*

The confrontation clause of the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that " 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " (*Idaho v. Wright* (1990) 497 U.S. 805, 813 [110 S.Ct. 3139, 3145, 111 L.Ed.2d 638].) The confrontation clause precludes admission of hearsay evidence unless the prosecution demonstrates that the statement possesses adequate indicia of reliability. Reliability may be inferred, without more, if the evidence is admitted under a firmly rooted hearsay exception. Otherwise, the evidence is presumed unreliable and must be excluded absent a showing of particularized guarantees of trustworthiness such that adversarial testing would be

---

[14]We do not mean to suggest that notice is always sufficient if given anytime before the jury is sworn. The trial court has discretion in each instance to determine whether the party adverse to the statement had a fair opportunity to prepare to meet the statement, depending upon the particular circumstances of each case.

expected to add little, if anything to the statement's reliability. (*White v. Illinois* (1992) 502 U.S. 346, 357 [112 S.Ct. 736, 743, 116 L.Ed.2d 848]; *Idaho v. Wright, supra,* at pp. 814-816, 818, 820-821 [110 S.Ct. at pp. 3145-3147, 3148, 3149-3150]; *People v. Eccleston, supra,* 89 Cal.App.4th at p. 443; *People v. Duke* (1999) 74 Cal.App.4th 23, 29 [87 Cal.Rptr.2d 547].) Whether " 'particularized guarantees of trustworthiness' " exist is determined by examining "the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." (*Idaho v. Wright, supra,* at pp. 819, 820 [110 S.Ct. at pp. 3148, 3149].) Other corroborating evidence presented at trial may not be used to make a finding of reliability. (*Id.* at pp. 821, 823 [110 S.Ct. at pp. 3149-3150, 3150-3151].)

 Evidence Code section 1360 is not a firmly rooted hearsay exception for purposes of confrontation clause analysis (*People v. Eccleston, supra,* 89 Cal.App.4th at p. 445), and in any event, the prerequisites of section 1360 were not satisfied. Thus, we must determine whether Maria's statements bore particularized guarantees of trustworthiness.

 In *Idaho v. Wright, supra,* 497 U.S. at pages 821-822 [110 S.Ct. at pages 3149-3150], the court identified a number of nonexclusive factors that are relevant to the determination of whether child hearsay statements possess the requisite indicia of reliability: (1) spontaneity and consistent repetition of the statement(s); (2) the declarant's mental state; (3) the declarant's use of terminology unexpected of a child of similar age; and (4) the lack of a motive to fabricate. (*Ibid.*) Courts have "considerable leeway in their consideration of appropriate factors." (*Id.* at p. 822 [110 S.Ct. at p. 3150].) The "unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." (*Ibid.*) We independently review a trial court's determination that the statements bore sufficient indicia of reliability. (*Lilly v. Virginia, supra,* 527 U.S. at p. 136 [119 S.Ct. at pp. 1899-1900] [plurality opinion of Stevens, J.]; *People v. Cromer* (2001) 24 Cal.4th 889, 898 [103 Cal.Rptr.2d 23, 15 P.3d 243]; *People v. Eccleston, supra,* 89 Cal.App.4th at pp. 445-446.) Here, apparently due to the People's late invocation of Evidence Code section 1360, the trial court did not hold a hearing to determine whether the "time, content, and circumstances of the statement provide[d] sufficient indicia of reliability," (Evid. Code, § 1360), and the trial court made no explicit findings as to reliability.[15]

Two of the *Wright* factors tend toward a finding of reliability. First, the record suggests Maria had no motive to fabricate, given her age and,

---

[15]The trial court concluded the statement was "obviously admissible" under Evidence Code section 1360 if the notice and unavailability requirements of the statute were met, suggesting the court assumed Maria's statement was reliable.

according to Martina, her affection for appellant. Second, while Maria's statements did not include terminology unexpected of a child her age, her simulated sexual behavior with the toy and her mother indicated she had seen or participated in sexual activates beyond the ken of three-year-old children.

On the other hand, the remaining factors do not point to a finding of reliability. The "ella and Poppy" statement was, according to Martina, offered in response to Martina's nonleading question, "who taught [you] to play that way." However, there were few facts adduced regarding the circumstances surrounding Maria's subsequent statements that she wanted to "play like Daddy plays." The record does not disclose whether Maria made those subsequent statements in response to leading or suggestive questions, or prompting. (E.g., *Idaho v. Wright, supra,* 497 U.S. at pp. 810, 826-827 [110 S.Ct. at pp. 3143-3144, 3152-3153] [fact pediatrician asked leading questions, i.e., "Does daddy touch you with his pee-pee" and whether child had touched father's genital area, suggested unreliability].) Moreover, there is no showing Maria ever repeated, to anyone other than Martina, accusations that her father had taught her sexual behavior. (Cf. *In re Lucero L.* (2000) 22 Cal.4th 1227, 1250 [96 Cal.Rptr.2d 56, 998 P.2d 1019] [evaluating *Wright* factors in child dependency proceeding; child's consistent repetition of account of molestation to three persons tended to show reliability]; *People v. Eccleston, supra,* 89 Cal.App.4th at p. 446 [fact child gave several persons substantially same account of molestation supported finding of reliability]; *People v. Brodit, supra,* 61 Cal.App.4th at p. 1330 [consistent repetition to at least five adults suggested reliability].)

As to the remaining factor, the record reveals very little about Maria's mental state because no competence hearing was held. There was, for example, no evidence regarding her cognitive abilities or tendency to tell the truth. (See *In re Cindy L., supra,* 17 Cal.4th at pp. 30, 35 [child's ability to understand duty to tell truth and distinguish between truth and falsehood is relevant to determination of reliability]; *People v. Eccleston, supra,* 89 Cal.App.4th at p. 446.) Thus, this factor does not support a finding of reliability.

No other factors in the record before us suggest reliability. Based upon the totality of circumstances presented to the trial court, we cannot say with confidence that "an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial." (*Idaho v. Wright, supra,* 497 U.S. at p. 821 [110 S.Ct. at pp. 3149-3150].)

b. *Prejudice.*

Finally, we are unable to conclude the constitutional violation was harmless. While the People's case was strong, appellant's defense was not weak. The key evidence against appellant was Stephanie's testimony. Stephanie's pretrial statements and testimony were not free from significant inconsistencies. Some aspects of her account (e.g., picking the garage door lock, climbing the stairs to the garage window) appeared improbable in light of other evidence at trial. It was undisputed that, prior to her stay with appellant in June of 1999, Stephanie had engaged in and seen significant sexual behavior. She had been found simulating intercourse with a young boy, had been found inappropriately kissing girls at school, and testified that she had seen adults engaging in sexual behavior in "novellas." Stephanie recounted an incident in which boys had tied her hands, taped her mouth, and attempted intercourse; she also recounted a cousin's attempt at sexual activity. If false, these accounts lent credence to the defense theory that Stephanie was prone to imagine or confuse instances of sexual abuse; if true, these earlier experiences showed additional exposure to sexual matters, explaining Stephanie's precocious sexual knowledge. The physical evidence of molestation was not compelling. While Stephanie's hymen was missing, the examining physician testified that the hymen could be lost in an accident such as falling from a bicycle. Given that Stephanie recounted just such an injury, this evidence was not particularly probative. While the lack of physical trauma to either child certainly did not preclude a finding of abuse, the physical evidence did not bolster Stephanie's account of events.

The evidence that appellant was responsible for any prior molestation, causing Stephanie's sexual behavior, was weak. Stephanie's testimony regarding how she knew appellant had previously molested her was confused; she could not recall what purportedly happened in the earlier incident, and recalled the incident only after speaking with her mother. The reported 1996 statement that her father would be angry was susceptible to the interpretation that appellant had previously molested her, but it was also susceptible to the interpretation that appellant would be angry at her for engaging in the conduct with someone else.

The defense presented evidence that shortly before the allegations surfaced, Martina had been told to "wise up" because appellant "wanted to take the custody of the children away from her." Sagrero testified to Martina's statements showing hostility to appellant. This evidence suggested Martina had a motive to falsely accuse appellant.

Against this backdrop, evidence of Maria's statements, amounting to assertions that appellant had molested her, was compelling. If the jury had

any doubts about the credibility of Stephanie's testimony, those doubts must have evaporated upon hearing about Maria's statements. There was no suggestion Maria's precocious sexual knowledge predated her stay with appellant. Thus, her statements identifying appellant as the source of the sexual behavior were strong corroborating evidence of Stephanie's account of events. Given the record before us and the strictures of the *Chapman* standard, we are unable to say with confidence that the error was harmless beyond a reasonable doubt.[16]

DISPOSITION

The judgment is reversed.

Croskey, Acting P. J., and Fidler, J.,* concurred.

---

[16]Given our conclusion that the error was prejudicial, we do not reach appellant's remaining contentions that his trial counsel was ineffective and that he is entitled to additional days of custody credit.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.