Filed 2/5/16  P. v. Shaw CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ROBERT M. SHAW, Defendant and Appellant. | D068686 (Super. Ct. No. SWF1301567) |


APPEAL from a judgment of the Superior Court of Riverside, Angel M. Bermudez, Judge.  Affirmed.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Sean M. Rodriguez, Elizabeth M. Carino and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Robert M. Shaw of two counts of lewd touching of a child under the age of 14 (6-year-old Jane Doe; Pen. Code,[1] § 288, subd. (a); counts 2, 4).  In two other counts, Shaw was found guilty of lesser included offenses from those originally charged, i.e., guilty of attempted sexual penetration of a minor under the age of 10 and simple battery.  (§§ 664, subd. (a); 288.7, subd. (b); 242; counts 1, 3.)  These charges arose after Doe and her mother Nancy C. (Nancy) visited Shaw and his girlfriend at their house over a period of several months.

The jury also rendered guilty verdicts against Shaw on one count of witness dissuasion against Nancy (§ 136.1, subd. (b); count 5); one count of criminal threats (§ 422; count 6); and one count of possession of a firearm by a convicted felon (§ 29900; count 7).  Related allegations of use or threat of force, and firearms use, were found true on the witness dissuasion and threat counts.  (§§ 136.1, subd. (c); 12022.5, subd. (a); 1192.7, subd. (c)(8).)  Shaw was sentenced to 45 years in prison.

On appeal, Shaw contends the trial court prejudicially erred by admitting into evidence a social worker's videotaped interview of Doe, completed shortly after the incidents were reported, as violating both the hearsay rule of Evidence Code section 1360 and his Sixth Amendment constitutional rights to confrontation of witnesses.  (U.S. Const., 6th Amend.; *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 (*Crawford*).) He argues that the record discloses that Doe was a materially unreliable or incompetent witness, both as shown in the videotape and by her testimony at trial two years later (at

---

[1]     All further statutory references are to the Penal Code unless noted.

eight years of age). He thus contends the trial court erred and violated his rights of confrontation by allowing the videotape to be shown to the jury while Doe was present in court to testify, but after she had given only a minimal or inadequate amount of foundational testimony. (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367 (*Roberto V.*).) He claims he was entitled to a grant of new trial, on the basis of insufficient evidence of the molestation counts.

Shaw further argues that the trial court committed prejudicial evidentiary and confrontation error by excluding evidence of a previous unrelated sexual assault by Nancy's ex-husband A.C. (Doe's father) against a half-sister of Doe. Shaw argues that such evidence would have been highly probative of Nancy's motivation to falsely accuse him or to try to predispose Doe to make such accusations. (Evid. Code, § 352.) Cumulative error is also asserted as to the molestation counts, although no arguments are made as to the witness dissuasion convictions.

Finding no prejudicial state or constitutional error in this record, we affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Background: The Incidents*

For a few months in the fall of 2011, Nancy and Shaw's then-girlfriend Caccia Holster (now his wife), were nursing students who studied together at the home shared by Shaw and Holster. Until mid-December 2011, Nancy brought Doe along, and Doe turned six in November 2011. Shaw was usually present at the house during such visits, and Doe would usually watch television and movies with him from the couches in the front

3

room, while Nancy and Holster studied in the next room, with the door open. Shaw was 48 years old in 2012, and was known to his friends as a father-figure type person who liked being with and playing with children at family gatherings, roughhousing and tickling them. He often gave Doe and other children he knew presents and candy.

A few months later, on January 31, 2012, Doe was getting ready for bed when Nancy asked her if anyone had hurt her or touched her in a way that should not happen. Doe told Nancy that Shaw had tickled her "butt" and her "cochina" through her pants as they were watching movies.[2] Doe said that Shaw told her he would stop giving her candy and toys if she told anyone what happened. Nancy responded to Doe that Shaw could get into trouble if it was true, and Doe said it was true.

Nancy called Holster and reported what Doe said. They argued and Nancy told Holster to forget what happened and to forget her phone number. The next day, February 1, 2012, Nancy reported to a school administrator that Doe had been abused and then filed a police report.

The night of February 1, Holster drove Shaw over to Nancy's house. One of Nancy's neighbors overheard a man riding in a car yelling, "Where's the bitch. Where's the bitch live?" The neighbor could not identify Shaw as the man in the car who started yelling at Nancy that he wanted to "clear up some fucking allegations" she had made against him. Nancy recognized Shaw and told him to leave, closing the door, and he

---

[2]    Nancy and Doe used the expressions "cochina" for vagina and "butt" for buttocks. According to the trial judge, cochina is a Spanish language word normally meaning dirty or big.

started pounding and kicking the screen door and calling her names. He said he was not scared and threatened to kill her, her daughter, and Nancy's boyfriend Carlos.[3] Nancy knew that Shaw had a gun and thought that she saw it tucked in his waistband.

Some neighbors showed up, and Shaw argued with them, then left with Holster. Nancy called the police, but did not mention a gun in her 911 call. After about an hour and a half, police arrived and interviewed her. She told them Shaw had lifted his shirt to show her a handgun tucked in his waistband.

Meanwhile, Shaw and Holster went to the house of Holster's and Shaw's friend, Stacy Pimentel, who had previously lived with Shaw as a family member. Shaw asked Pimentel whether he had ever made her feel uncomfortable, and she said no, but expressed the opinion that the person who molested Doe "could have been anybody." Shaw angrily punched a hole in the wall, and Pimentel called police. She saw Shaw hand a gun-like object to Holster. Police arrived and Holster mentioned that Shaw had a knife when he went over to see Nancy. Holster said it was Nancy who started the yelling and screaming.

A month later, on March 1, 2012, Doe was interviewed by a social worker, Katie, a member of the Riverside Child Assessment Team (RCAT). We describe this taped interview in more detail in the discussion portion of this opinion (pt. I.B, *post*). In short, Doe answered questions by saying that she understood the concept of telling the truth.

---

[3] On appeal, Shaw does not challenge his convictions for threats and dissuading a witness. We describe those events only generally, and they are relevant to his other arguments, such as entitlement to a new trial for insufficiency of the evidence.

She made a few mistakes in answering preliminary questions about her school subjects and teachers and the date of her birthday. When asked why she came to the office that day, she said it was to talk about "Bob," as she knew Shaw, and she described her acquaintance with him. They used to watch TV at his house while her mother was in the next room, and one day, Shaw pulled down her pants and put his fingers in her "cochina," which she explained was in the "front" of her body, where the "peepee" comes out. She also said that he tickled her butt (which she identified as where she goes potty), he had used both hands and hurt her, and he told her not to tell her mother. She said this had happened once, but then said she remembered another time as well. She also described the incident when Shaw came over to the house and yelled at her mother and scared them.

### B. Motions in Limine; Introduction of Videotape

At the outset of trial, defense counsel brought a motion in limine seeking a competency hearing for Doe under Evidence Code sections 402 and 701, on the grounds that the recording of her RCAT interview gave rise to doubts about whether she understood the basic nature of the oath to tell the truth, and whether she had the capacity to communicate her allegations without being led by adult questioning. (*Roberto V., supra,* 93 Cal.App.4th at p. 1367.) The court discussed related issues with counsel, including the hearsay exception in Evidence Code section 1360, subdivision (a) for

certain statements by a child about being molested.[4]  The court explained that it had reviewed the transcript and the interview appeared to be a reliable one within the meaning of the statute.  In it, Doe had promised to tell the truth and gave responsive answers to the interviewer's questions, and she appeared to be able to communicate quite well for a person of her age.

Subject to the other requirements of Evidence Code section 1360, the court determined that no separate hearing on competency would be necessary, because appropriate notice had been given that the statement might be used, pursuant to the statute's subdivision (b).[5]  The matter would be handled at trial by placing the child on the witness stand under oath, and based on the voir dire questioning, the court would be further evaluating her cognitive ability and development as it affected her testimony.  The jury could hear the video evidence and it would be instructed on how to evaluate the testimony of a child witness by considering her cognitive ability and development, and her

_____

[4]     Evidence Code section 1360, subdivision (a) provides:  "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:  [¶] (1) The statement is not otherwise admissible by statute or court rule.  (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.  (3) The child either:  [¶] (A) Testifies at the proceedings.  (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child."

[5]     Evidence Code section 1360, subdivision (b) requires advance notice to the adverse party by the proponent of the statement, before any use of such a statement in a proceeding.  Charges of child abuse to which this section applies include acts proscribed by section 11165.1.  (Evid. Code, § 1360, subd. (c).)

7

ability to perceive events and communicate her understanding of them.  Counsel tentatively agreed to that approach.

Before trial, defense counsel sought discovery about an incident in which Nancy's former stepdaughter M., who was older than Doe, had been raped or molested in 2006 by Nancy's former husband A.C., the father of both girls.  Defense counsel argued that Nancy had been talking about that incident to another witness, such that it might lead to evidence about Doe's potential hypersexual awareness, in terms of Nancy having frequent discussions with Doe about bad touching.  The court ordered that such information be made available, if the prosecutor had it.

Next, the court conducted a hearing under Evidence Code section 402 on the prosecutor's motion in limine to exclude evidence about the molestation of Doe's half-sister M.  Nancy explained that once Doe started going to day care when she was four years old (2009-2010), Nancy routinely asked her every few months whether anyone had touched her private parts in an inappropriate way.  Nancy denied knowing any details about the molestation or rape of her former stepdaughter, and said that that was not the reason that she split up with her former husband in 2006, while Doe was still an infant.

The court concluded the hearing by declining to order further discovery about the stepdaughter as requested by the defense, and it further delineated the permissible scope of examination of the witnesses (both expert and percipient) as to the discussions between Nancy and Doe and what they talked about in terms of potential sexual misconduct.  The court ruled that the genesis of those conversations, or why Nancy would have brought the topic up with the child, was not relevant and not probative as to

8

the issues in the current litigation, and such evidence would be excluded under Evidence Code section 352.

## C. Trial Testimony

The week before Doe testified, a witness advocate from the prosecutor's office was present when Doe reviewed her RCAT interview. When Doe was called as a prosecution witness, she answered preliminary questions about her understanding of the importance of telling the truth, and how she might get into trouble if she did not do so, and she said she understood.

Doe then answered other questions about where she lived and how she used to visit Shaw and Caccia (Holster) at their house. She did not recognize Shaw in the courtroom, even though she said she knew him for a long time. She said, "sometimes we would just watch TV, but then he did what he did sometimes too," which she explained was inappropriate behavior or touching, as she had told her mother. She also described talking to the interviewer at the hospital.

Defense counsel renewed his objections to the playing of the interview video, both on confrontation clause grounds and as a state law objection, lack of any proper foundation to establish whether Doe could or could not remember what happened. He contended there should not be a trial initially based on the video, even in light of the hearsay exception provided by Evidence Code section 1360. The court stated that its previous ruling had determined that the criteria for this statutory exception had been established, in that the time, content and circumstances of the statements provided sufficient indicia of reliability, the required notice of intent to rely on the video had been

9

given, and the child was being made available as a witness at the current proceeding. (*Ibid*.) The court noted the defense objection for the record and determined that the video was admissible as a hearsay exception.

In Doe's presence, the jury then viewed the video of the RCAT interview and received transcripts of it.[6] The prosecutor asked her whether that was what happened during the interview and she agreed that it was. As will later be explained in more detail in this opinion, Doe testified directly and was cross-examined about photographic evidence and her memory of where she was sitting in the living room when the touching happened, once or twice, and how her mother was in the other room at the time, with her back toward her. (Pt. I.B, *post*.)

Nancy testified about her acquaintance with Holster and Shaw, and said that the last time she took Doe to their house was in mid-December 2011. Doe was never behind closed doors with Shaw at the house. On a social basis, Nancy and Doe went target shooting with the couple one time. Nancy described asking Doe every once in a while, in the two years after she started preschool, if anyone had touched her or hurt her in any way, and telling Doe that no one should touch her private parts. Nancy also discussed the matter with Doe by using some of the study materials from her college anatomy class. Doe did not answer affirmatively about touching until January 31, 2012, when she told her mother that Shaw had been tickling her butt and her cochina through her pants while they were watching movies. She reported that he told her not to tell her mother or else

---

6      The record contains the transcript of the interview, and Shaw has provided the video DVD for our review.

she would not be able to get candy or toys from him anymore.  Nancy called Holster to ask her about it, then they argued and she told her to forget their friendship.

The next day, Nancy went to the police to make a report.  That evening, she heard her dogs barking and discovered that Shaw was yelling and pounding on her front door.  He said he couldn't believe she would treat him like that and yelled, "I'll fucking kill you," as well as shouting that he would kill her daughter and her boyfriend.  She could see a gun tucked in his waistband and recognized it from the time that they went shooting together.  She had had a gun pulled on her before, when her ex-husband did so.  She did not tell the 911 dispatcher about Shaw's gun because she was lost for words and panicked at the time, and the dispatcher kept interrupting her.

About a month later, Nancy took Doe to a forensic interview at the hospital but was not present during it.  She learned later that there were no physical findings of abuse to Doe's body.  After the confrontation at her house, Nancy told Pimentel that Shaw had pointed a gun at her.  She denied ever telling Pimentel that she made up the gun story.  She said she never told anyone Doe had been in the bathtub when she made her disclosures.

Nancy's former neighbor testified about the night he heard Shaw come over and yell and curse at Nancy, accusing her of lying.  Pimentel was called as a prosecution witness, describing how Shaw had also confronted her that night and she ended up calling the police.  Somewhere between three and six months before trial, Pimentel testified that Nancy called her and asked her to back up her story.  Nancy then said she had made up the claims that Shaw had a gun when he came to the house, and she was thinking of

11

dropping the case. Until trial, Pimentel did not tell anyone that Nancy said she made up the gun story.

Holster testified that she and Shaw had been dating for six years, since she was 18, and they carried out their plan to get married about a week after the incident giving rise to the charges. When they first arrived at Nancy's house that night, Shaw was upset but calm, but he got loud and angry after Nancy yelled and cursed at him. Holster admitted that Shaw did not have a knife at that time, as she had earlier told investigators. She knew that as an ex-felon, he was not allowed to possess a firearm, and she did not want him to get into trouble.[7] When she and Shaw left Nancy's house, they went to Pimentel's house. Holster got her own gun out of her car and handed it to Shaw. When Pimentel called the police, Shaw handed the gun back to Holster. Holster went home while he stayed to talk to officers when they arrived. Testimony from the responding officers completed the prosecution's case-in-chief.

### D. Defense Evidence

Shaw presented character evidence, in which eight of his longtime female friends of different ages, including a 12 year old, testified he was trustworthy and they never saw him touching any children inappropriately. He liked seeing children at family gatherings and interacted well with them, often sharing candy or giving them toys.

---

[7]     Shaw stipulated to the element of a prior felony conviction concerning count 7, possession of a weapon by a felon. The trial court bifurcated proof of Shaw's other prior convictions (none of them for sexual offenses) from the guilt issues. Shaw did not testify at trial.

As expert evidence, the defense called Dr. Mitchell Eisen, a research psychologist, who testified about his knowledge of children's responses to typical interviews, and his review of Doe's RCAT interview. Even young children may be able to understand the difference between the truth and a lie, and may respond accurately to follow up questioning. However, a child's version of an incident can be readily influenced by a parent who tells them that someone involved is a bad person. When being interviewed, a child might give a false positive response if she does not understand the question being asked, is confused, wants to please the interviewer, or wants to leave the situation. In her interview, Doe did not appear to the defense expert to be overly intelligent, and she answered questions even if she did not understand them. He criticized the RCAT interviewer for failing to establish strongly enough that Doe could distinguish between true statements and lies, and for her excessive repetition of questions.

Shaw's expert witness Dr. Christopher North, a clinical psychologist, interviewed him and found no signs of any serious psychological problems. Shaw's responses to questions did not show the typical attitudes or experiences common to men who have a sexual interest in and who molest children, e.g., identifying emotionally with children. Rather, Shaw had a strong abhorrence of child molesters, and he wanted and expected to fulfill typical roles as a good father and provider for his family. During the interviews, a jail deputy was present and Dr. North had to rely extensively on Shaw's responses, and those circumstances would normally reflect an interviewee's desire to portray himself in the best light. There was no way to tell for sure if he was lying.

13

Several defense witnesses challenged Nancy's account of how she learned about the incident, and whether Shaw had a gun during the confrontation at her house. Nancy's supervisor for her tutoring job at college testified that Nancy told her the disclosure took place when Nancy was bathing Doe, and Doe began acting in an unusual way. The witness advocate from the District Attorney's office met Nancy prior to the preliminary hearing, and said that Nancy did not mention to her that Shaw had pointed a gun at her during their confrontation. Pimentel testified that Nancy called her several times to talk about how Nancy's ex-husband had been put away for sex crimes, and to ask for Pimentel's help in putting away Shaw, who she thought was also a bad man. Pimentel started avoiding her calls.

*E. Verdict, New Trial Motion and Sentencing*

Following instructions and deliberations, the jury returned verdicts of guilty of lesser included offenses for counts 1 and 3, convicting Shaw of attempted sexual penetration of a minor and simple battery. (§§ 664, subd. (a); 288.7, subd. (b); 242 [but the oral copulation/sexual penetration charges were not sustained].) Shaw was convicted on counts 2 and 4, lewd acts with a child (§ 288, subd. (a)), and on counts 5 through 7, dissuading and threatening a witness and possession of a firearm by a felon.

Pursuant to section 1181, subdivision (6), Shaw moved for a new trial on the ground that the evidence was not of sufficient probative value to sustain the jury verdicts on counts 1, 3, 4, and 5. He argued there was no significant evidence that sexual penetration or an attempt to do so took place. In court, Doe testified multiple times that Shaw only touched her cochina over her underwear, but after persistent questioning, she

14

changed her answer (to say that he also moved her underwear aside). She was unclear about whether the incident happened once or twice. Further, Doe's interview showed her confusion about when her birthday was and who her teacher was, and she could not identify how old she was when the incidents allegedly occurred. Shaw argued there was insufficient evidence to sustain counts 1, 3, 4, and 5.

In opposition, the prosecutor argued that the statements Doe made to the RCAT interviewer supported the verdict, and her testimony was consistent in showing that she believed that Shaw had actually placed his hand inside her genitalia, more than once. The jury could have reasonably believed that Doe was telling the truth, even though she made mistakes about dates, because such mistakes were consistent with her age and cognitive ability. The trial court denied the new trial motion and sentenced Shaw to 45 years in prison.

DISCUSSION

Shaw first contends the trial court abused its discretion by admitting the RCAT interview into evidence. We outline his reasons for claiming Doe's videotaped statements were materially unreliable, and that the manner in which they were presented at trial was unduly prejudicial and amounted to violations of his federal confrontation and due process rights. We also address his claim that his motion for new trial should have been granted for insufficient credible evidence.

In part II, *post*, we discuss Shaw's contentions that under Evidence Code section 352 and confrontation principles, the trial court erroneously excluded evidence about Nancy's potential bias and motivation to make false accusations against him, based on her

15

knowledge of the 2006 molestation or rape by her ex-husband of her former stepdaughter. Cumulative error arguments are also presented.

## I

*ADMISSION OF VIDEOTAPED INTERVIEW AND DOE'S RELATED TESTIMONY*

### A. Applicable Standards: State Law Claims

Evidence Code section 1360 permits admission into evidence of statements by a young victim recounting acts of child abuse or neglect if, in addition to proper notice being given, the court finds sufficient indicia of reliability in the statements, and the child testifies or there is independent corroboration of the abuse. In determining reliability (and also whether the statements bear particularized guarantees of trustworthiness under the confrontation clause), courts have " 'considerable leeway in their consideration of appropriate factors.' " (*Roberto V., supra,* 93 Cal.App.4th at p. 1374.) The courts may consider such factors as: (1) spontaneity and consistent repetition of the statements; (2) the mental state of the declarant; (3) the declarant's use of terminology unexpected of a child of similar age; (4) the lack of a motive to fabricate; and (5) the child's ability to understand the duty to tell the truth and to distinguish between truth and falsity. (*Ibid.*, citing *Idaho v. Wright* (1990) 497 U.S. 805, 821-822; see *In re Cindy L.* (1997) 17 Cal.4th 15, 29-30 [identifying factors as "nonexhaustive," and adding to them the child's ability to understand the duty to tell the truth and to distinguish between truth and falsity]; *In re Lucero L.* (2000) 22 Cal.4th 1227, 1250 [in addition to *Idaho v. Wright* factors, any factor bearing on reliability may be considered].)

16

On whether a minor victim is competent to testify, the general rule is that "every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1149-1150 (*Montoya*).) "A person is incompetent and disqualified to be a witness if he or she is '[i]ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him' [citation], or is '[i]ncapable of understanding the duty of a witness to tell the truth' [citation]. [Citation.] A witness's competency to testify is determined exclusively by the judge." (*Ibid*.) This determination includes the preliminary facts of capacity of the witness to understand the oath, and to communicate. (*Ibid*.) On review of the evidentiary ruling, an abuse of discretion standard is applied. (*Roberto V., supra*, 93 Cal.App.4th at p. 1368.)

Once the witness is allowed to testify on a certain subject, the determination of whether he or she perceived and can recollect the events being described is left to the trier of fact. (*Montoya, supra*, 149 Cal.App.4th at pp. 1149-1150.) In general, "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) In an extreme case, the trial court may exclude testimony that is deemed to be inherently incredible or demonstrably false. (*People v. Hovarter* (2008) 44 Cal.4th 983, 996 (*Hovarter*).)

On appeal, the appellate court's task is different. When required to decide if sufficient evidence supports a verdict, as with Shaw's new trial argument, we must

17

determine whether the record contains substantial evidence from which a reasonable jury could find the accused guilty beyond a reasonable doubt. (*Hovarter*, *supra*, 44 Cal.4th at pp. 996-997.) " 'In evaluating the sufficiency of evidence, "the relevant question on appeal is not whether we are convinced beyond a reasonable doubt" [citation], but "whether ' "any rational trier of fact" ' could have been so persuaded." ' " (*Id*. at p. 997.)

On review, the courts apply an abuse of discretion standard for the hearsay and related competency analyses required by Evidence Code section 1360. (*Roberto V.*, *supra*, 93 Cal.App.4th at p. 1367.) On these points, Shaw seeks to apply the standards of *People v. Watson* (1956) 46 Cal.2d 818, 836, which compel reversal if "it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

B. Record and Arguments on Unreliability of RCAT Video of Child Witness

Before the jury was selected, the court reviewed the transcript of the interview and made a finding that it appeared to be accurate as a transcript and was sufficiently reliable as a witness statement, in view of its timing, content, and the circumstances under which it was given. The prosecutor anticipated presenting Doe as a trial witness, along with submitting the videotape into evidence. (Evid. Code, § 1360, subds. (a)(2), (3)(A).) Once Doe was called as a witness, she answered preliminary questions about her ability to tell the truth, where and with whom she lived. Although she did not recognize Shaw in court, she knew that she used to know "Robert" and to go to his house when another person who lived there, Holster, needed her mother's help with studying things. Doe said she spent time with Robert watching TV, and that he also did other things too, such as

18

inappropriate behavior and touching, which is what the whole case was about. She told her mother after it happened and then went to a hospital to talk to an interviewer about it.

When the prosecutor started to play the video, Shaw's attorney objected and the court discussed the matter with counsel in chambers. Defense counsel claimed the prosecutor had not revealed that he would be playing the video with the child on the stand, and said that this was equivalent to having a trial based on the video. The court replied that the hearsay exception of Evidence Code section 1360 applied, and overruled the objection as to foundation.

Over defense objection, the prosecutor then played the video and provided transcripts for the court and the jury. In the interview, Doe said she was there to talk about Shaw, who did "bad things" to her when she went over to his house, while Nancy and Holster were in the other room. Once while he and she were watching television, they were leaning back together in a really big chair when he pulled down her pants, left her underwear in place but moved it aside, and tried to "go in [her] cochina" and hurt it. His two hands were trying to go in her cochina fast. He also tried to tickle her butt. Later, she told the interviewer that he was "going in" her butt "really strong" with his hands, more than tickling, and it hurt. She added that Shaw touched her on another occasion, and both times, he "did [the] same thing."

After Doe watched the video with the jury, the prosecutor showed her photographs and she identified in them presents that she thought Shaw had given her, and the way the living room looked when she went over to Shaw's and Holster's house. She also

19

remembered that Shaw came over to the house with a gun, saying bad words and scaring her and her mother.

During cross-examination, Doe testified that she was not sure how old she was when she told her mother about the touching, and that she and her mother sometimes talked about whether anybody had touched her in a way that they were not supposed to do. She remembered it was nighttime, although she was not yet in her pajamas, when she told her mother that Shaw "tickled [her] butt." Defense counsel asked what else Doe told her mother about the touching, and she replied that she said Shaw put his hand in her cochina and her butt. Nothing had happened with her underwear, and it was still up. She said that he put both hands in her cochina and her butt at the same time, and it hurt a little bit. He told Doe not to say "ow" even though it hurt. During redirect testimony, Doe demonstrated that Shaw had pulled her underwear down or over with one hand and used the other hand to go in her cochina and butt.

C. Analysis of State Law Claims: Showing of Video at Trial

Shaw first claims the trial court should have found that Doe's statements were unreliable on the face of the RCAT interview and transcript. He objects that no defense counsel was present during the interview, and since Doe did not testify at the preliminary hearing, he had no opportunity to challenge her credibility until trial, in cross-examination. However, he can cite to no authority that a defendant has a right to counsel at such an investigatory interview, before any charges are brought. (See *Kentucky v. Stincer* (1987) 482 U.S. 730, 740 [no error in excluding defendant from a competency hearing if later opportunity for effective cross-examination allowed]; *California v. Green*

20

(1970) 399 U.S. 149, 159 [even where defendant did not have ability to cross-examine a witness at the time a prior statement was made, later cross-examination at trial may be adequate]; 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 18, p. 57.)

Instead, the main focus of his argument is that Doe was an unreliable witness and the interviewer only asked her briefly about whether she understood how to tell the truth or if there were consequences for lying. During the interview, six-year-old Doe made some mistakes in answering the interviewer, and answered questions even if she did not know the answer (e.g., "what's your gender?" "I don't have one.") She made some math mistakes in describing her schooling and rambled a bit when answering questions. The interviewer reminded her to say when she did not know an answer, and she agreed. She gave an incorrect date for her birthday and wasn't sure how old she was at the time of the incident, saying she was either five or six, and then, that it happened at both ages.

Shaw argues that the trial court erred in concluding from this transcript that Doe was responsive to questions and able to communicate well for a person of her age. Once Doe started describing the incident, she was inconsistent on some details in her story, first saying Shaw touched her once, then saying she forgot and it was two times. Shaw argues Doe's account was physically implausible or impossible, to claim that he used both of his hands to go into her small body, especially when they were not behind closed doors and her mother was in the next room.

When finding that the interview evidence was admissible under Evidence Code section 1360, the trial court stated it had reviewed the transcript and made a finding that the time, content and circumstances of the statements provided sufficient indicia of

21

reliability.  In the interview, Doe said she knew the difference between a lie and a truth and that she understood she was supposed to tell the truth.  (Evid. Code, § 702 [witness must have personal knowledge of the facts stated in testimony].)  The interviewer's questions were open ended and they followed through with additional questions based upon Doe's prior answers.  The Evidence Code section 1360 issues were thoroughly litigated before and during trial, and notice was given that hearsay material would be presented and that the child would testify, as she did.  Shaw has not shown that the applicable state law standards for authenticating the transcript were not met.  (See pt. I.D, *post*, regarding the confrontation clause arguments.)

Shaw further argues that the court abused its discretion by allowing the interview to be played in the presence of Doe, on insufficient foundational testimony.  This is apparently an argument that the court erred in controlling the order of proof at trial, rather than any question of first impression, as newly contended in his reply brief.  It is well settled that a trial judge has a broad scope of discretion in controlling the proceedings during criminal trials.  (*People v. Contreras* (1989) 210 Cal.App.3d 450, 456.)  "In relation to evidence, [Pen. Code, §] 1044 states that it is the judge's duty 'to limit the introduction of evidence . . . to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' " (5 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 647, p. 1001.)

Shaw seems to claim that in light of other testimony at trial, the interview was clearly excludable as overly suggestive and prejudicial.  For example, there were no physical signs or findings of abuse, and he argued that Nancy's practice of questioning

Doe every few months about whether anyone had touched her inappropriately was possibly an overzealous one. The defense psychologist Dr. North examined Shaw and determined that his responses to questions did not show he had any sexual interest in children, and instead, he abhorred child molesters. Shaw's defense witnesses, including seven women who knew him well, were unaware of any previous allegations of sexual misconduct against him, and there were none.

Shaw contends that the evidence of his confrontation of Nancy, when he learned of the charges, could properly be interpreted as a demonstration of outraged innocence. He points to the jury's relatively lengthy deliberations (over three court days) and its nine written inquiries to the court, as showing this was a very close case. Shaw contends these factors confirm that the admission of the RCAT interview was prejudicial error. However, we do not apply hindsight analysis, and we evaluate the trial court's discretionary decision to allow the evidence on the basis of the information before it, as of the time of the ruling. (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 998.) Moreover, the prosecutor's witness advocate had already shown the video to Doe about a week before trial, as part of case preparation.[8]

---

[8] Since the interview video was properly admitted into evidence under Evidence Code section 1360, we see no reason to discuss the Attorney General's alternative argument that refreshing a witness's recollection is an accepted procedure. (Compare Evid. Code, § 771, subd. (a) [witness may review a writing to refresh recollection before trial, if writing is disclosed to adverse party].)

As an alternate argument, Shaw contends the trial court erred in denying his new trial motion, which was based on the ground that the evidence was insufficient to sustain the verdict on counts 1, 3, 4, and 5. (§ 1181, subd. (6).) Shaw mainly argued that Doe's accounts of two adult hands being inserted into a six-year-old's genital area are physically impossible and improbable, especially when her mother was in the next room. He also suggested that Doe had been coached on what to say, as shown when she said she "forgot" that the touching of her cochina happened a second time.[9]

On this record, we cannot conclude that the trial court abused its discretion in finding that the evidence as a whole supported the verdict, including the RCAT interview. In determining its admissibility, the trial court considered appropriate factors as identified in *Roberto V., supra,* 93 Cal.App.4th 1350, 1374 and other authorities. The relatively minor variations among Doe's statements to the interviewer and her statements at trial, and the amount and type of mistakes she made in answering questions, did not significantly undermine the required statutory foundational showing of reliability. (Evid. Code, § 1360, subds. (a), (b).) She was made available for cross-examination and the jury had the ability to evaluate her credibility, as a child witness, as they were specifically instructed. (See *In re Cindy L.*, *supra*, 17 Cal.4th 15, 18 [a finding that a child witness

---

[9] In opposing the new trial ground of appeal, the Attorney General argues that the motion below excluded count 2, and no new argument should be allowed at this time. To the extent Shaw argued to the trial court that the evidence was unclear as to Doe's exact age on all counts, the record shows she was born in 2005 and was thus well under age 12, regarding the scope of coverage by the hearsay exception of Evidence Code section 1360. Because we find the denial of the new trial motion was justified, we need not address those particular issues.

lacks competence to understand difference between truth and falsity is not an absolute bar to the admission of her hearsay testimony, but relates to whether her statement is reliable].)

" 'Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution . . . .' " (*Hovarter*, *supra*, 44 Cal.4th 983, 996, citing *People v. Cudjo* (1993) 6 Cal.4th 585, 609; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) In his closing argument, Shaw was able to argue to the jury that Doe's account of the incident in the video was disjointed and confusing, and he noted she had ignored a question about touching and instead blurted out that Shaw said bad words to her mom and threatened to kill them. In light of all the evidence, including her testimony at trial, the jurors could have concluded that Shaw moved and adjusted Doe's clothing and touched her as she testified he did, and they were entitled to evaluate and believe her.

Moreover, even in light of the conflicting evidence presented in Shaw's defense, he has not shown it was error to deny his motion for a new trial. The trial court had broad discretion in determining whether the evidence was of a sufficiently probative nature to uphold the verdict, as against the new trial motion. (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1252.) In denying the motion, the court noted that the evidence had been presented in a somewhat unorthodox manner, with minimal direct examination before the prosecutor's playing of the video. However, the court determined that any issues for the defense regarding inconsistencies in her story were adequately protected by

his exercise of the right of confrontation. The court saw no reason to undo the jury's decision on the sexual impropriety counts.

Later in the hearing, at sentencing, the court noted that the jury was necessarily an objective factfinder that had to evaluate the partisan witnesses, and it had conscientiously evaluated the evidence as shown by its many questions of the court. This record does not demonstrate any abuse of discretion in the order denying the new trial motion.

D. Applicable Standards and Analysis: Confrontation Clause Claims

Shaw alternatively argues the manner in which the evidence was presented at trial, as summarized above, operated to create confrontation clause violations. He points to the playing of the video while Doe was on the witness stand, before she had given more than minimal foundational testimony, as prematurely confirming her testimonial version and thwarting meaningful cross-examination. He claims there was error and it was harmful beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18; *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681-684.)

In analyzing such claims about the presentation of evidence, the appellate courts utilize an independent standard of review. (*Roberto V., supra*, 93 Cal.App.4th at pp. 1373-1374.) We apply the standards of *Crawford*, *supra*, 541 U.S. 36, which clarify that the confrontation clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Id.* at p. 59, fn. 9; *California v. Green*, *supra*, 399 U.S. at pp. 158, 168; *People v. Cage* (2007) 40 Cal.4th 965, 991.) Doe was present at trial and her prior statements were admissible under a state law exception to the hearsay rule, Evidence Code section 1360. She had previously reviewed the video

26

a week before trial. Defense counsel's competency motion and in limine requests raised generalized foundational objections, which were properly overruled, as discussed above.

In her testimony, Doe provided substantive testimony about how she remembered going to the hospital for her interview, and she confirmed after the playing of the video that that is what she said. She testified on direct, cross-, and redirect examination about her recollection of the events. " '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679, original italics; *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 53 ["Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses."].) The cross-examination at trial questioned her perceptions and memory, and exposed some inconsistencies in her answers, which the jury was able to evaluate. (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) On this record, constitutional standards were met and no Sixth Amendment error has been shown.

II

*EXCLUSION OF EVIDENCE REGARDING POTENTIAL BIAS*
*OR SUGGESTIBILITY; CUMULATIVE ERROR*

A. Evidence Code Section 352 Ruling; Arguments

As already outlined, an issue arose at trial about the possible effect on Doe of Nancy's knowledge that her former stepdaughter M. had been raped or molested by Nancy's former husband A.C., the father of both girls. Defense counsel sought discovery about whether there were witnesses who could show Nancy reacted by engaging in

27

excessively frequent discussions with Doe about bad touching, such that Doe might have developed a "hypersexual awareness" of sexual terminology.

The prosecutor brought a motion in limine to exclude such evidence, and the court conducted a hearing under Evidence Code section 402. Nancy testified that after she and her ex-husband separated in 2006, she learned from the mother of M. that A.C. had raped M. and was in jail. When Doe was little, Nancy told her that her dad, A.C., was in jail for "hurting his kids," without explaining (until later) what that meant. Nancy explained that once Doe reached day care age, Nancy routinely asked her whether anyone had touched her private parts in an inappropriate way.

The prosecutor acknowledged that Shaw was justified in seeking permission to inquire into Nancy's prior conversations with Doe regarding inappropriate touching. However, the court limited the evidence in this regard, stating there were numerous levels of separation between the information about the ex-husband's assault on M. and the present case, so that information about it would have very little probative value. The court accordingly ruled that the genesis of the conversations between Nancy and Doe about inappropriate sexual touching was not relevant to or probative on the issues at trial, so it would be excluded under Evidence Code section 352.

On appeal, Shaw contends this ruling was not only an abuse of discretion, but it further interfered with his right to fully confront the witnesses against him. He argues that evidence of M.'s sexual assault would have helped him explain why Nancy seemed to be out to get him as a "bad man," like her ex-husband was. Nancy repeatedly called Pimentel to try to get her to back up Nancy's story that Shaw was a bad man, but

28

Pimentel resisted those requests. Shaw also argues that more evidence on Nancy's family background would have allowed him to show why she was so persistent in questioning Doe every three or four months about bad touching. According to his expert's testimony, children like Doe are readily subject to such influence by their authority figures and they may mold their opinions to suit what they are told, which could lead to false accusations.

Even assuming that Nancy was influenced by her former stepdaughter's bad experience, this evidence about what happened to M. was still remote and nonprobative on the issue of Doe's ability to communicate and explain what happened to her at Shaw's house, including on cross-examination. With respect to Nancy's motivations, the evidence did not show that she had a problem with men like Shaw up until the time Doe made her disclosures, as she had been friendly with him and Holster during the past months. The trial court had a reasonable basis to conclude that more inquiry into the ex-husband's guilt and Nancy's knowledge about it would degenerate into a " 'mini-trial' " on collateral issues that were too remote from Shaw's charges. (*People v. Hamilton* (2009) 45 Cal.4th 863, 930 [evidence excludable if it requires a mini-trial and would be limited in its probative value]; *People v. Contreras* (2013) 58 Cal.4th 123, 152 [recognizing court's "wide latitude" to exclude collateral, irrelevant evidence].)

Even with the ruling in place, Shaw was able to show that Nancy asked this type of question every few months, over a period of several years, both through her own testimony and that of Doe. His attorney suggested during closing argument that Nancy had some kind of agenda in reporting the offense, or she had somehow put things into Doe's head. The jurors could evaluate Nancy's behavior for the part it played as the main

29

influence in Doe's life. We conclude the ruling excluding further inquiry into the assault against M. by A.C. comported with the standards of Evidence Code section 352, because its probative value could reasonably be viewed as being substantially outweighed by the probability of "undue prejudice, of confusing the issues, or misleading the jury." (*Ibid.*, subd. (b).) Shaw has not shown an abuse of the trial court's "broad discretion" in making this evidentiary ruling. (*People v. Lewis* (2001) 26 Cal.4th 334, 374.)

### B. Confrontation Arguments

In view of the exclusion of evidence concerning A.C.'s reported rape of Doe's half-sister M., Shaw makes related claims that he was prevented from fully exercising his Sixth Amendment rights to confront and cross-examine Nancy on all relevant issues. Although the Attorney General argues Shaw forfeited such a constitutional claim on appeal, we think the objections he raised at trial about Nancy's purported bias, interest, or motive in reporting the charges to police were broad in nature and arguably encompassed such constitutional claims on his ability to confront the witnesses against him. (See *People v. Pearson* (2013) 56 Cal.4th 393, 455 [a defendant should be given "wide latitude" in challenging the credibility of a prosecution witness].)

Shaw argues not only that Nancy had a bias against him, based on her previous family experience, but also that such experience led her to question Doe excessively about bad touching. Shaw complains that the prosecutor argued in closing that Nancy had no motive to coach Doe to make false accusations, and Shaw claims that more extensive evidence about M.'s molestation would have helped him show Nancy had an

30

improper motive or agenda to make charges against him, such as getting even somehow with bad men in general.

Pursuant to Evidence Code section 352, the trial court had the discretion to impose reasonable limits on the presentation of evidence, geared toward avoiding confusion of the issues or irrelevant inquiries. (*People v. Pearson*, *supra*, 56 Cal.4th 393, 455.) The trial court had a reasonable basis to conclude that Nancy's credibility was already being challenged, and that allowing further cross-examination on an event that was five years old, involving different individuals, would not have produced " 'a significantly different impression of [the witness's] credibility.' " (*Ibid.*; *People v. Cornwell* (2005) 37 Cal.4th 50, 95 [trial courts retain " 'wide latitude' " to impose limits on cross-examination on marginally relevant topics, consistent with confrontation clause principles].)

Since Shaw was allowed to question Doe and Nancy about their prior conversations regarding the need to tell about any sexual touching, the jury was given some evidence with which to evaluate Nancy's "persistence" on the subject. Evidence that another child known to Nancy had been sexually assaulted by another individual, some years before, would not have materially assisted the jury in ascertaining the relevant facts in this case. Other prosecution evidence included Shaw's confrontation of Nancy at her house, which could arguably be considered as showing consciousness of guilt. (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 684 [prejudice analysis includes the importance of testimony and the extent of cross-examination allowed].) We decline to find that the trial court erred in this respect, and need not address harmless error issues. (See *People v. Cage, supra*, 40 Cal.4th at p. 991.) Since neither state evidentiary error or

31

constitutionally significant error occurred at Shaw's trial, we do not address cumulative error claims.

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

McDONALD, J.

AARON, J.