Filed 8/19/24  P. v. Arroyo CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAJUAN WELCH ARROYO,<br><br>    Defendant and Appellant. | B332413<br><br>(Los Angeles County<br>Super. Ct. No. MA081061) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden A. Zacky, Judge.  Affirmed.

Halpern & Halpern and H. Russell Halpern for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Stephanie A. Miyoshi, and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Jajuan Welch Arroyo (Arroyo) appeals from his conviction for first degree felony murder (Pen. Code, § 187, subd. (a))[1] and second degree attempted robbery (§§ 211, 664). He contends the trial court erroneously instructed the jury on a legally inadequate theory of felony murder for the "actual killer." He also contends there was insufficient evidence to support his attempted robbery conviction. We agree the felony murder instructions were erroneous but conclude the error harmless beyond a reasonable doubt. We conclude Arroyo forfeited his argument as to the sufficiency of the evidence for the attempted robbery conviction. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Arroyo arranged to buy marijuana from Tyler Edwards. Shortly after the sale in the parking lot of Edwards's apartment complex, two men approached Edwards with a gun, demanding Edwards take them to his apartment and "give them the money." Edwards screamed out to his girlfriend, Samantha Mena, who ran out of the apartment and chased the men. The men ran to Arroyo's car and got inside. Mena then ran in front of Arroyo's stopped car. Arroyo drove forward, hitting Mena with his car and killing her.

I.   **Relevant Prosecution Evidence**
   A.   **The attempted robbery and killing of Mena during the escape**

Edwards lived at the Racquet Club Apartments with Mena. Edwards sold large amounts of marijuana and advertised his

---

[1]   All undesignated statutory references are to the Penal Code.

products online.  He kept the marijuana and cash he earned inside his apartment.

In October 2020, Arroyo texted Edwards for the first time about buying marijuana.  Edwards sent Arroyo a link to an online "menu" that showcased Edwards's inventory of marijuana products.  Arroyo asked Edwards, " 'You only deal with cash?,' " to which Edwards responded, " 'Yeah, I only deal with cash.' "  At some point, Arroyo asked if Edwards was successful at selling marijuana, and Edwards replied that he "ma[d]e some money off of it."

Over the next five months, Edwards sold marijuana to Arroyo "at least 20 times."  Each sale would cost hundreds to thousands of dollars.  Most of the transactions occurred in the parking lot of Edwards's apartment complex, although a few times Edwards went to Arroyo's house or his workplace to drop off items.

On March 26, 2021, Arroyo arranged to buy marijuana from Edwards.  At 8:12 p.m., Arroyo texted, " 'I'm here.' "  Edwards left his apartment and met Arroyo in the parking lot.

Arroyo was in the driver's seat of a four-door silver Hyundai.  No one else was in the vehicle.  After the hand-to-hand exchange through the open car window, Arroyo drove toward the back of the apartment complex.

As Edwards walked toward his apartment, he noticed two men running up behind him.  Both men were African American, "heavier set," at least six feet tall, and wearing surgical masks and dark clothing.  One of them was also wearing a ski mask, which was orange or red, "on top of his head, like a beanie."  One of the men shoved a gun in Edwards's face.  Both men repeatedly told Edwards to take them to his apartment and to "give them

3

the money." The man with the gun said, "If he doesn't cooperate, I'm going to smoke him right here."

Edwards cried out to his girlfriend Mena to lock their apartment door. At that point, the two men hit Edwards in the back of the head and face several times, knocking him to the ground.[2]

At some point, Edwards saw Mena run down the stairs from their apartment and chase after the men. It took some time before Edwards was able to stand up. Eventually, he made his way to the driveway area of his apartment complex and saw Mena lying on the ground.

Minutes earlier, Sarah Le and her husband were driving near the Racquet Club Apartments. As they approached the apartment complex, a four-door silver sedan leaving the driveway of the complex almost "T-bone[d]" Le's car. The sedan braked "really hard" to avoid hitting her car. Shortly afterwards, as the car Le was in passed the driveway, Le heard what sounded like the sedan hitting "something metal" or "[s]omething hard." The sedan stopped but then drove off.

Le's mother, Lori Gilroy, was a few cars behind Le's car, driving her own car. As Gilroy's car approached the apartment complex, Gilroy heard a "loud noise." The car in front of Gilroy's car swerved, and Gilroy did too. Gilroy saw a woman, later identified as Mena, lying in the roadway. Gilroy then made a U-turn, parked her car behind Mena to block traffic, and called 911.

Gilroy saw two African American men on the sidewalk who made Gilroy feel "nervous" and "unsafe" because they were

---

[2]     Edwards subsequently was treated at the hospital, where he received staples for his head injuries and stitches on the inside and outside of his mouth.

4

"cussing and kind of moving around real quick and sketchy." One of the men was "more heavyset" and was wearing a "dark-colored sweatshirt hoodie," while the other one was wearing a white t-shirt. The men yelled "that they had to get out of there." One of the men stated, "Where did he go? We've got to go. We've got to go." The men "took off running" toward a silver car. Then, Gilroy heard two car doors shut and saw a silver car speed away. She no longer saw the two men in the vicinity. Gilroy approached Mena. It looked like Mena had been hit "pretty hard" because her "whole left side" was "bruised pretty bad."

Deputy Carlos Camargo of the Los Angeles County Sheriff's Department (LASD) happened to be driving near the apartment complex and saw Mena lying on the ground, with people gathering around her. Camargo exited his car and approached to render aid. Mena was unresponsive. After finding a "very weak pulse," Camargo started CPR on Mena. Camargo saw "grease marks" on her shirt. Edwards approached, frantic and with a "very bloody face," and said he had been robbed.

The fire department arrived and took Mena to the hospital. She died soon afterward at 8:47 p.m. The cause of death was determined to be multiple blunt force trauma.

Within minutes after witnesses heard the loud noise and found Mena injured in the street, three men in the parking lot of a nearby restaurant caught Denise Carroll's attention. The men walked "fairly fast" toward Carroll and her boyfriend. One man came from the area of the Lancaster Inn, behind the restaurant, while the other two came from the area to one side of the restaurant. Carroll heard sirens and saw police cars "whipping around the corner." She "knew something wasn't right" and told her boyfriend to get in the car.

5

One of the men, a "light-skinned African American" man wearing a "red hoodie," stood in front of Carroll's car. The second man stood to the left of the first man. The third man came up as if he was "deciding which way he wanted to go." The three men then went inside the restaurant. Carroll drove towards the police cars on the scene with Mena and talked to the police.

Shortly afterward, LASD Deputy Lia Winter began looking for the car that hit Mena. Winter drove to the Lancaster Inn parking lot and found a silver sedan in the lot, with a handprint on the hood. The car was impounded.

## B.  **Evidence collected at the scene**

LASD Detective Esteban Soliz investigated the crime scene. Soliz found blood (from the assault on Edwards) along the walkways leading to Edward's apartment and inside Edwards's apartment. Inside Edwards's apartment, detectives found a large amount of marijuana and a number of guns, including "ghost guns," which are "weapons that are bought through the internet with no serial numbers and can't be traced."[3]

Soliz also found a red beanie or mask near the stairs leading to Edwards's apartment. Edwards testified the red mask looked like the mask that one of his assailants wore. Deputies found Arroyo's DNA on the mask among four DNA contributors.

Deputies examined the silver sedan that was impounded from the Lancaster Inn parking lot. They found blood stains on the "rear passenger side roof" of the vehicle, the driver's side rear wheel area on the undercarriage of the vehicle, and the exhaust pipe. Mena's DNA was on the rear wheel area and the exhaust

---

[3]     Detective Leopoldo Sanchez testified that marijuana, ghost guns, and cash are items that "people like to steal."

pipe. Arroyo's DNA was found on the driver's side door handle and on a water bottle found inside the car.

C. **Surveillance footage**

Surveillance camera footage from the Racquet Club Apartments, the Lancaster Inn, and the restaurant was played for the jury.

Footage showed that around 8:00 p.m. a man wearing a light-colored hat and a dark-colored sweater drove a silver sedan through the north gate of the Racquet Club Apartments. The man was identified as the same individual who was later with Arroyo at the restaurant.

Due to camera "blind spots," the next time the sedan appeared on camera was at a carport area inside the apartment complex. At some point, the sedan drove through the complex and stopped. Shortly after, an individual walked up to the driver, appeared to speak with the driver, and then walked away. Edwards identified himself as the person who approached the car on foot, and he stated at that point Arroyo was the person in the driver's seat. Edwards testified that was the moment he sold marijuana to Arroyo.

The sedan then exited the south gate of the parking lot and stopped in the driveway area. Meanwhile, two men, later identified as the pair who attacked Edwards, ran through the apartment complex, with Mena running behind them. The men ran out of the apartment complex through the north gate and ran south on the sidewalk, with Mena running behind them.

While the sedan was still stopped in the driveway, a person with a light-colored hat got into the sedan on the rear driver's side. The video showed "a second shadow, believed to be the second individual, come around the vehicle." Shortly after, Mena

7

ran in front of the sedan as it was stopped in the driveway with its brake lights illuminated.  Then the car drove forward into the street.[4]

Footage from the Lancaster Inn showed the silver sedan park in the motel parking lot at around 8:31 p.m.  Three individuals got out of the car.  One was wearing a light-colored hat.  The driver was wearing red.  Later, a person with a red hoodie walked from the Lancaster Inn parking area towards the restaurant.  The person with the red hoodie was with a person with a light-colored hat and a black sweater.

Restaurant security camera footage captured three men walking into the restaurant.  One man wore a dark-colored top with a light-colored hat, one wore a black shirt with a red jacket, and one wore a red hoodie.  Edwards identified the man in the red hoodie as Arroyo.  Edwards testified that the "upper half" of the other two men looked similar to the men who attacked him.

The three men sat in the lobby of the restaurant for a while and then left without getting anything to eat.  One of the men returned to the sedan and moved it to a different area of the Lancaster Inn parking lot—the same area where deputies later found the sedan that they impounded.

D.    **Expert testimony**

LASD Detective Aaron Percy, an expert in traffic collisions, provided a reconstruction of the traffic collision involving Mena.  Percy testified that the silver sedan was in the apartment

---

[4]    Officers found Mena's body near the driveway of the apartment complex.  The surveillance video does not show the car hitting Mena because the camera angle was blocked by a wall.

8

complex driveway when the incident occurred. The area in front of the car was lit up by the car's front lights and a streetlamp.

While the car's brake lights were on, Mena ran in front of the car. Mena approached from the front driver's side of the car and ran to the front corner of the passenger's side. She was facing the car, wearing a light blue top, and her skin color was "white." Because of Mena's appearance and the lighting conditions at the time, Mena was "clearly visible at the time the incident took place." Because the driver was attempting to make a right turn, he would have been looking towards his left, the direction from which Mena had approached.

Percy opined that as the car turned right, it ran Mena over. Her head was on the outside of the car and her body was underneath the car. The car dragged her body into the street. Mena's injuries, her "resting" position, the marks on the ground, and the tears on Mena's clothes were all consistent with the car running Mena over and dragging her. After the car ran over Mena, nothing else struck her.

## II. *Defense Evidence*

Babak Malek testified for the defense as a traffic collision expert. Based on the "frame rate" of the available video footage, Malek calculated the timing of the collision.

He determined that after one of the passengers got into the car, it took 8.53 seconds for Mena to first appear on the video. It took another 1.13 seconds for Mena to reach the front left corner of the car. It then took Mena .86 seconds to move to the front center of the car. Thus, Mena was visible for under two seconds. During that time, the car's brake lights were on. The brake lights went off .46 seconds later and the car drove forward.

9

Malek opined that generally, when an "unanticipated event" occurs, a driver's average reaction time is up to 1.5 seconds. "[S]omeone running in front of your vehicle" is an unanticipated event. Malek opined there was not enough time for the driver to recognize that Mena was in front of the car and stop the car from moving forward. The driver was "still . . . trying to perceive what's happening."

III. ***Felony Murder and Causation Instructions and Closing Arguments***

At trial, the prosecutor relied on the theory that Arroyo was guilty of felony murder as the actual killer. The prosecution argued that Arroyo killed Mena by hitting her with his car while he escaped the attempted robbery.

The trial court instructed the jury with the standard felony murder instruction, former CALCRIM No. 540A, used when the defendant is alleged to have committed the fatal act, i.e., is the actual killer. The court told the jury that Arroyo was guilty of felony murder if the People proved that (1) Arroyo committed or attempted to commit robbery; (2) Arroyo intended to commit robbery; and (3) while committing or attempting to commit robbery, Arroyo "*caused the death of another person.*" (Former CALCRIM No. 540A (Sept. 2019 rev.), italics added).[5]

---

[5] The jury was instructed that "the perpetration of a robbery continues, for felony-murder liability purposes, so long as the robbers are in flight from the scene of the crime and have not reached a place of temporary safety." (*People v. Bodely* (1995) 32 Cal.App.4th 311, 313 (*Bodely I*) italics omitted; accord, *People v. Ainsworth* (1988) 45 Cal.3d 984, 1016, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665.) The jury was

10

Two months before Arroyo's trial, on March 24, 2023, the Judicial Council of California revised the third element of CALCRIM No. 540A in recognition of changes to the felony murder rule wrought by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437). In lieu of stating the defendant "caused the death of another person," the new instruction states "the defendant *personally committed* (an/the) act[s] that *directly caused* the death of another person." (CALCRIM No. 540A (March 2023) (rev.2023 ed.), italics added.) Neither defense counsel nor the People advised the court of the revised pattern instruction or requested the court give it.

The court also instructed the jury on proximate causation with CALCRIM No. 240: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] There may be more than one cause of death. An act causes death, only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not have to be the only factor that causes the death."

During closing arguments, the prosecutor began by saying, "On March 26, 2021, while fleeing the scene of an attempted robbery, this defendant ran over Samantha Mena with the car he

---

also properly instructed that the person killed need not be the intended victim of the robbery (*People v. Welch* (1972) 8 Cal.3d 106, 118-119), and that an actual killer may be guilty of felony murder even if the killing was purely accidental. (*People v. Billa* (2003) 31 Cal.4th 1064, 1068; *People v. Albert Garcia* (2022) 82 Cal.App.5th 956, 968-969.)

11

was driving, murdering her." The prosecutor argued that after Arroyo bought marijuana from Edwards, Arroyo drove towards the exit of the apartment complex, stopped his car, and waited for the other two men. At some point, the two men got into Arroyo's car. While the car was stopped, Mena stood in front of the car to prevent the men from escaping. "Then the defendant r[an] over her." Later, the prosecutor argued, "He is the actual killer because he was the driver. He was the one that drove over her, making him the actual killer." She went on to argue, "Because he set [Edwards] up to be robbed, because he lured [Edwards] out to be ambushed, and because he was the get-away driver, and because he ran over [Mena] while fleeing the scene of that attempted robbery, because we have shown all of that, that he attempted to commit a robbery, that he intended to commit that robbery, and while attempting to commit that robbery he caused her death, he is also guilty of murder."

Arroyo's primary defense was that there was no evidence he participated in the robbery or knew the two perpetrators, who may have forced him to drive them away from the scene after they beat up Edwards. Arroyo did not dispute that he was the driver of the car that struck Mena, but instead argued Mena's death was an accident. Further, defense counsel told the jury the key question was whether Arroyo's "act of driving forward" was "the reason [Mena] is gone." He contended Mena "running in front of a vehicle" was an "unexpected event" and, as defense counsel argued, it takes a person "1.5 seconds to see something and react to it." "[T]he second [Mena] comes into frame, it's less than 1.5 seconds before that car starts to move and hits her. He had no time to stop. No time to process the information and not hit her." In sum, defense counsel argued to the jury that because

12

"something unusual intervene[d]" and Arroyo "didn't even have time to react when that unusual thing happened," Arroyo did not cause Mena's death.

During the prosecutor's rebuttal argument, the prosecutor highlighted the instruction that there can be more than one cause of death, and that an act causes death if it is a substantial factor in causing the death. She then argued, "[E]ven if you think Samantha Mena, why did you get in front of that car, why did you try to stop them from leaving, even if you thought that, [Arroyo] is still legally responsible as long as his action, which is driving over her, is a substantial factor in causing that death. And it is."

## IV.  *Verdict and Sentencing*

In May 2023, the jury convicted Arroyo of first degree felony murder and attempted second degree robbery. The trial court sentenced Arroyo to 28 years to life in state prison, consisting of 25 years to life for the murder and three years for the attempted robbery.

Arroyo timely appealed.

## DISCUSSION

## I.  *The Felony Murder Jury Instruction Was Erroneous, but the Error Was Harmless*

The court instructed the jury with former CALCRIM No. 540A, advising them Arroyo was guilty of felony murder if the People proved that (1) Arroyo committed or attempted to commit robbery; (2) Arroyo intended to commit robbery; and (3) while attempting to commit robbery, Arroyo "*caused the death of another person.*"  (Italics added.)  Arroyo contends the instruction was erroneous because it failed to accurately define

13

one of the elements—the third element concerning the defendant's homicidal act.  Specifically, Arroyo contends the instruction omitted the requirement that he be found the actual killer, i.e., the individual who "personally" and "directly" caused the death of another person.[6]  Although we agree the instruction was erroneous, the error was harmless beyond a reasonable doubt.

### A.  The "actual killer" requirement for felony murder under section 189, subdivision (e)

By the time of Arroyo's trial in March 2023, SB 1437 had revised the felony murder rule.  In relevant part, SB 1437 amended section 188 by adding the following language:  "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)  It also added section 189, subdivision (e), which provides that felony murder liability attaches only if the person was:  (1) the actual killer; (2) an aider and abettor who acted with the intent to kill; or (3) a major participant in the underlying felony who

---

[6]  We reject the People's contention that Arroyo forfeited his claim by failing to object to the trial court's instructions.  " 'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.'  [Citation.]  'But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law.' "  (*People v. Javier Ruben Rodriguez Garcia* (2020) 46 Cal.App.5th 123, 154; accord, *People v. Vang* (2022) 82 Cal.App.5th 64, 80, fn. 4.)

acted with reckless indifference to human life.  (§ 189, subds. (e)(1)-(3).)

The People contend SB 1437 left "unchanged" the legal principles relevant to individuals who were the sole perpetrators of the act causing death.  They contend the term "actual killer" in section 189, subdivision (e), "merely distinguishes who, *among multiple accomplices*, is 'the *actual* killer.' "  They further argue "[i]t is plain from the overall context of [SB] 1437 . . . that the Legislature did not concern itself with the culpability of and punishment for sole perpetrators but sought only to ensure proportionate punishment for *accomplices* of the actual killer."  By contrast, Arroyo contends SB 1437 changed the felony murder laws to add as an "essential element" under section 189, subdivision (e)(1), the fact that the defendant was the actual killer who personally caused the victim's death.

"The interpretation of a statute is a question of law as to which we exercise our independent judgment.  [Citation.]  As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent to effectuate the purpose of the law.  We begin by examining the words of the statute, giving them a plain and commonsense meaning, in context, keeping in mind the nature and purpose of the statute.  [Citation.]  If the statutory language is clear and unambiguous, there is no need for further construction.  [Citation.]  But if the language is unclear or ambiguous, the court may refer to other indicia of the intent, such as legislative history."  (*People v. Vang* (2022) 82 Cal.App.5th 64, 85 (*Vang*).)

In *Vang*, *supra*, 82 Cal.App.5th 64, the appellate court rejected the People's argument that SB 1437 was intended to modify only accomplice liability and not felony murder liability

15

for defendants alleged to have committed the homicidal act. (*Vang*, at pp. 87-88.)  The court held, "If the Legislature's intent had been to limit its changes to accomplice liability, the text of [SB] 1437 presumably would have said so.  Here, the word 'accomplice' is never used in the text and there is nothing in the language of section 189, subdivision (e) which limits its application to cases involving accomplices. . . .  While it is true that [SB] 1437 substantially modified the law relating to accomplice liability for felony murder, it is equally evident that the Legislature was concerned about more than the liability of accomplices and wanted to address some of the broader criticisms of the felony-murder rule."  (*Id.* at p. 87.)

What specifically did the Legislature intend in providing that it must be "proven" the defendant was "the actual killer" for purposes of felony murder liability under section 189, subdivision (e)(1)?  The term "actual killer" is not defined in section 189.  The *Vang* court held that "the term 'actual killer' was intended to limit liability for felony murder—in cases where section 189, subdivision (e)(2) or (3) do not apply—to the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act.  In other words, the intent was to conform California law to the 'agency theory' of felony murder liability, under which criminal culpability is restricted to deaths directly caused by the defendant or an accomplice, as distinguished from the 'proximate cause' theory of felony murder, under which a defendant is responsible for any death that proximately results from the unlawful activity."  (*Vang*, *supra*, 82 Cal.App.5th at p. 88; accord, *People v. Lopez* (2022) 78 Cal.App.5th 1, 18-19 (*Lopez*); see also *People v. Javier Ruben Rodriguez Garcia* (2020) 46 Cal.App.5th 123, 151 (*Rodriguez Garcia*) [" '[P]roximately

16

causing and personally inflicting harm are two different things.' "]; compare *People v. Carney* (2023) 14 Cal.5th 1130, 1138 (*Carney*) [proximate cause of death is " ' "an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur" ' "] with *Vang*, at p. 90 ["[t]o personally kill the victim is to directly cause the victim's death"].)

In *Vang*, the defendant, who had a long history of domestic violence, got into an argument with his wife, and the wife fled in her car. (*Vang, supra,* 82 Cal.App.5th at p. 69.) The defendant followed her, forced her to stop, and coerced her into his car. (*Ibid.*) As the defendant drove away, his wife jumped from the moving car and died. (*Ibid.*) The trial court instructed the jury that it could find defendant guilty of first degree felony murder if it found that the defendant "caused" his wife's death during the kidnapping. (*Ibid.*)

Relying on the legislative history of SB 1437 and persuasive authorities, the *Vang* court held the trial court erred by instructing the jury with an improper definition of "actual killer." It determined the legislative history of SB 1437 showed the Legislature's intent that the term "actual killer," as used in section 189, means the person who personally killed the victim. (*Vang, supra,* 82 Cal.App.5th at p. 88.) After the Legislature removed (without explanation) the phrase "personally committed the homicidal act" from SB 1437 and replaced it with the term "actual killer," the Senate Rules Committee still described the purpose of the bill as revising the felony murder rule to prohibit imputation of malice unless the person " 'personally committed the homicidal act.' " (*Vang,* at p. 87, citing Sen. Rules Com., Off.

17

of Sen. Floor Analyses, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.), as amended Aug. 20, 2018, p. 7.)

  *Vang* also drew support from *Rodriguez Garcia, supra,* 46 Cal.App.5th 123, for the interpretation that the term "actual killer" means the person "who personally killed the victim." (*Vang, supra,* 82 Cal.App.5th at pp. 90-91.) In *Rodriguez Garcia,* the appellate court examined the meaning of "actual killer" under section 190.2, the felony murder special-circumstance provision.[7] (*Vang,* at p. 90, citing *Rodriguez Garcia,* 46 Cal.App.5th at pp. 151-155.) *Rodriguez Garcia* concluded that "the meaning of ' "actual killer" ' under section 190.2 is literal: the actual killer is the one who personally killed the victim." (*Vang,* at p. 90, quoting *Rodriguez Garcia,* at p. 152.) Thus, *Rodriguez Garcia* held "CALCRIM No. 730, the standard instruction for the felony-murder special circumstance, was inconsistent with the law because it allowed the jury to find the defendant guilty as an 'actual killer' based on general causation principles." (*Vang,* at p. 90, citing *Rodriguez Garcia,* at p. 152, fn. 33.) *Vang* additionally found support from *Lopez, supra,* 78 Cal.App.5th 1, which held that "the term 'actual killer' [under section 189, subdivision (e)] means someone who personally killed the victim, not someone who merely commits an act that is a proximate

---

[7] *Vang* concluded that "[a]lthough [section 189 and section 190.2] serve different purposes, nothing suggests the Legislature intended the term 'actual killer' to have one meaning for purposes of the felony-murder rule, and a different meaning under the felony-murder special-circumstance statute. To the contrary, as the former expressly incorporates language from (and references) the latter, the logical implication is that the Legislature intended them to be the same." (*Vang, supra,* 82 Cal.App.5th at pp. 90-91.)

cause of the victim's death." (*Vang*, at p. 91, citing *Lopez*, at pp. 16-19.)

The *Vang* court held that the felony murder jury instruction given was flawed "because jurors were not provided a proper definition of 'actual killer.' " (*Vang*, *supra*, 82 Cal.App.5th at p. 91.) Thus, the instruction allowed jurors to find the felony murder special circumstance true if the jury determined the defendant "caused" the victim's death based on general causation principles and not based on a finding the defendant "personally committed the homicidal act." (*Ibid*.) The court reversed the conviction "[b]ecause the evidence [did] not permit any inference that defendant was the direct cause of [his wife's] death." (*Ibid*.)

We find *Vang* persuasive and likewise conclude the Legislature intended the term "actual killer" in section 189, subdivision (e), to mean a person who personally and directly committed the act causing the death of another.

B. **The felony murder "actual killer" instructions were erroneous**

"We apply a de novo standard when determining whether jury instructions were complete and correctly stated the law. [Citation.] We consider the challenged instruction in the context of the instructions and record as a whole to determine whether it was reasonably likely the jury misapplied the law." (*Vang, supra,* 82 Cal.App.5th at pp. 84-85; accord, *People v. Kelly* (1992) 1 Cal.4th 495, 525 ["the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts"].)

The trial court instructed the jury that it could find Arroyo guilty of felony murder if it found that while committing the robbery, Arroyo "caused" Mena's death. The court did not

19

instruct the jury that it had to find Arroyo *personally committed* the act that killed Mena. The jury instructions given here thus suffered from the same flaw as those in *Vang* and *Rodriguez Garcia*—they "were inadequate because jurors were not provided a proper definition of 'actual killer.' The jury was permitted to find defendant guilty of felony murder . . . based on an invalid legal theory." (*Vang, supra*, 82 Cal.App.5th at p. 91.) Further, although the prosecutor argued that Arroyo was the "actual killer" who ran over Mena, the prosecutor never informed the jury that it had to find Arroyo personally committed the homicidal act in order to find him guilty of first degree murder. The instructions were therefore erroneous.

### C. **The instructional error was harmless**

The People argue the error is harmless beyond a reasonable doubt because there is "overwhelming and uncontested evidence" that Arroyo "struck Mena with his car, directly causing her death." We agree.

When a trial court instructs the jury on a theory of guilt that "is legally erroneous at the time it was given," we assess whether the error was harmless under the strict standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Gentile* (2020) 10 Cal.5th 830, 851, superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869; *People v. Birdsall* (2022) 77 Cal.App.5th 859, 867-868 (*Birdsall*).) The *Chapman* standard requires us to " 'reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt.' " (*Gentile*, at p. 851.) This standard applies to "errors involving the omission or misdescription of elements of a charged offense."

20

(*Birdsall,* at p. 868; see *People v. Merritt* (2017) 2 Cal.5th 819, 831.)  The Attorney General has the burden to show the error was harmless.  (*People v. Madrigal* (2023) 93 Cal.App.5th 219, 242; *People v. Avalos* (2022) 85 Cal.App.5th 926, 953.)

An instructional error involving the omission or misdescription of an element will be deemed harmless "only in unusual circumstances," such as where (1) the element was undisputed, (2) the defense was not prevented from contesting the element, and (3) overwhelming evidence supports the element.  (*People v. Merritt, supra*, 2 Cal.5th at p. 828; accord, *Birdsall, supra,* 77 Cal.App.5th at p. 871.)  Stated another way, we must review the record to determine " 'whether [it] contains evidence that could rationally lead to a contrary finding' " with respect to the omitted or misdescribed element.  (*People v. Mil* (2012) 53 Cal.4th 400, 417; see *People v. Serrano* (2022) 77 Cal.App.5th 902, 913.)  Here we ask, is it possible the jury could have determined Arroyo was involved in the robbery that resulted in Mena's death, but was not the person who directly killed her by striking her with a car?  The answer is no.

> 1. *Arroyo Had the Opportunity To Dispute He Ran Over Mena While Driving but Instead Conceded the Issue*

The defense had every opportunity to contest whether Arroyo was the one who ran Mena over and killed her.  (Cf. *People v. Sandoval* (2007) 41 Cal.4th 825, 839 [the defendant "did not necessarily have reason—or the opportunity—during trial to challenge the evidence supporting these aggravating circumstances" because aggravating circumstances "were not part of the charge and were not directly at issue in the trial"].)

21

The identity and actions of the person who struck Mena were central issues at the trial.

But at trial, it was undisputed that Arroyo was the one who hit Mena with his car. The prosecutor argued, "[H]e was the driver. He was the one that drove over her . . . ." Defense counsel conceded that fact, stating, Mena "ends up running in front of my client's vehicle as it's trying to exit the parking structure . . . . He had no time to stop. No time to process the information and not hit her." At no point during trial or on appeal has Arroyo argued a juror rationally could have determined one of the other men who got into the silver sedan was driving the car at the time it hit Mena. It was also undisputed that Arroyo's act of running Mena over with his car killed her.

2.    *The Evidence That Arroyo Personally and Directly Ran Over Mena Is Overwhelming*

Overwhelming evidence establishes Arroyo personally killed Mena by striking her with the car he was then driving, inflicting fatal injuries. At 8:12 p.m., Arroyo texted Edwards that he had arrived at Edwards's apartment complex. Edwards's testimony, supported by surveillance video, established Edwards sold Arroyo marijuana while Arroyo was in the driver's seat of the silver sedan in the apartment complex parking lot. Edwards had personally sold marijuana to Arroyo approximately 20 other times, and thus a jury could credit his identification of Arroyo as the person in the driver's seat during the March 26, 2021 hand-to-hand transaction.

Edwards testified that immediately after the sedan drove off after the exchange, two other men approached on foot and assaulted him, before Mena came down from the apartment and began chasing the two men on foot. Surveillance video captured

Mena chasing the two men until the men caught up to the sedan in the driveway of the apartment complex and got into the car. While the sedan was stopped in the driveway, Mena ran in front of the car. The car then ran Mena over, dragged her body into the street, and drove off. No other cars hit Mena, and she died of blunt force trauma shortly after the collision.

Immediately after the collision, Gilroy saw two men (who did not match the description of Arroyo) running toward a silver car. All the evidence suggests these two men were the same men who had assaulted Edwards. After the two men ran down the street, Gilroy heard two car doors shut and saw a silver car speed away, suggesting a third person was in the driver's seat already.

The timeline leaves no room for Arroyo to have left the driver's seat prior to the time Mena was struck. Moreover, video surveillance showed a person resembling Arroyo park the car at the Lancaster Inn a few minutes after the car struck Mena. Arroyo's DNA was on the driver-side front door handle.

We find instructive *People v. Bodely* (2023) 95 Cal.App.5th 1193 (*Bodely II*), which concerned whether the trial record conclusively established the defendant was the actual killer such that the denial of a section 1172.6 petition was proper. In *Bodely II*, the defendant was fleeing a robbery when a man ran in front of the defendant's car to stop the defendant from fleeing. (*Id.* at p. 1196.) The man went to the driver's side window of the defendant's car, put his arm inside the car, and told the defendant to stop. (*Ibid.*) The defendant hit the man with his car, knocking the man to the ground and killing him. (*Ibid.*) The jury convicted the defendant of first degree felony murder and found true the special allegation that the defendant personally used a deadly and dangerous weapon (a car) in the commission of

the murder. (*Ibid*.) The jury had been instructed that it could find the defendant guilty of murder if the killing "occur[red] during the commission . . . of the crime or as a direct causal result" of the robbery. (*Id.* at p. 1197.) After SB 1437 went into effect, the defendant petitioned under section 1172.6 to be resentenced based in part on his argument the record did not establish as a matter of law that he was the "actual killer." (*Bodely II*, at p. 1199.) The trial court denied the petition, finding the defendant failed to make a prima facie showing of entitlement to relief because the jury necessarily determined the defendant was the "direct perpetrator" and the record contained no suggestion there was an accomplice. (*Id.* at p. 1198.)

The *Bodely II* court affirmed the trial court's denial, finding the record conclusively established the defendant was the actual killer. (*Bodely II*, *supra*, 95 Cal.App.5th at p. 1201.) The court distinguished the case from *Vang*, in which the victim had jumped out of the defendant's moving car, thereby causing her own death. The court stated, "Here, by contrast, defendant directly hit [the victim] with a car, and [the victim] died from head trauma because his head struck the payment after being hit by the car. This was not disputed at trial. No other contributing factor was alleged to be involved in [the victim's] death, and the record contains no indication that [the victim] played any role in contributing to his own demise analogous to the victim in *Vang*." (*Bodely II*, at p. 1202.) The court found once the jury determined that appellant was the driver, it had to conclude that he was the actual killer because the record "conclusively established that defendant did more than set in motion a chain of events that produced [the victim's] death," and instead directly caused the death. (*Id.* at pp. 1204-1205; see *id.* at p. 1202 ["the record

24

conclusively established that defendant 'personally killed' [the victim], instead of merely proximately causing [his] death"]; *People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1247 [finding "no legal route [defendant's] jury could have taken to convict him without finding he was [the] actual killer"].)

As in *Bodely II,* the facts here demonstrated that Arroyo directly hit Mena with his car, and Mena died from blunt force trauma due to the car accident. There is no evidence in the record that could rationally lead a jury to find that Arroyo did not personally kill Mena. (Compare *Birdsall, supra*, 77 Cal.App.5th at pp. 870-871 [error in allowing jury to convict defendant of felony murder if it found defendant merely "caused" the victim's death was harmless because defense did not contest that defendant personally strangled the victim to death; defense counsel contested only " 'what was going on in [the defendant's] mind' "; and there was "overwhelming evidence" that defendant personally strangled the victim] with *Vang, supra*, 82 Cal.App.5th at p. 80 [error in giving similar jury instruction was not harmless where the defendant's wife jumped from the defendant's vehicle "of her own volition," and there was no evidence that the defendant's actions personally and directly caused the wife's death] and *Rodriguez Garcia, supra*, 46 Cal.App.5th at pp. 149, 156-157 [error in giving similar jury instruction was not harmless because defense contested that defendant personally put duct tape over victim's mouth, resulting in victim's asphyxiation, and prosecutor expressly relied on theory that defendant "caused" the victim's death solely by handing duct tape to a co-perpetrator].)

To the extent Arroyo contends Mena's act of running in front of the car was an unusual intervening act that could raise a

reasonably doubt whether Arroyo personally and directly caused Mena's death such that he was not the "actual killer," Arroyo is incorrect.

The trial court properly instructed the jury that "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  [¶]  [T]here may be more than one cause of death.  An act causes death, only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor.  However, it does not have to be the only factor that causes the death."  (CALCRIM No. 240, italics omitted.)  Arroyo does not contend that the causation instructions given to the jury were erroneous in any respect.

"When there is more than one contributing cause of death in a murder case, the law is clear:  '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death.  Rather, it is required [only] that the cause was a substantial factor contributing to the result.' "  (*Albert Garcia, supra,* 82 Cal.App.5th at p. 964; accord, *Carney, supra,* 14 Cal.5th at p. 1139.)

In arguing to the jury that Mena's act of running in front of the car was "something unusual [that] interve[ed]," the defense suggested Mena's act was a "superseding cause," i.e., "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it

26

unfair to hold him responsible." (*People v. Dawson* (2009) 172 Cal. App. 4th 1073, 1094, cleaned up.)  However, "[o]nly 'an unforeseeable intervening cause, an extraordinary and abnormal occurrence,' rises to the level of 'an exonerating, superseding cause.'  [Citation.]  Absent such conduct, evidence the victim 'may have shared responsibility or fault for the accident does nothing to exonerate [a] defendant for [his] role and is not relevant.' " (*People v. Zemek* (2023) 93 Cal.App.5th 313, 348-49.)  Moreover, "if an intervening cause is a reasonably foreseeable result of a *defendant's initial act*, ' "the intervening act is . . . not a superseding cause, and will not relieve [the] defendant of liability." ' " (*Carney, supra,* 14 Cal.5th at p. 1143, italics added.)

These concurrent causation principles have not been amended by SB 1437.  "With respect to felony-murder liability, [SB] 1437 . . . contains no expressed intent to modify the felony-murder rule's application to a perpetrator whose acts were a concurrent cause of the death." (*Albert Garcia*, *supra*, 82 Cal.App.5th at pp. 966–971 [rejecting defendant's argument that a robber should not be deemed an 'actual killer' under section 189, subdivision (e)(1) when an unintended and accidental death with a concurrent cause occurs; even though victim's preexisting heart condition contributed to his death, record unequivocally established defendant was the "actual killer" because his own actions of robbing and assaulting 82-year-old victim were a substantial factor in the death].)

Pursuant to the causation instructions it properly received, the jury here "necessarily consider[ed], in its determination of proximate cause, whether there was any intervening cause that was unforeseeable and constituted a superseding cause." (*Carney, supra,* 14 Cal.5th at p. 1143.)  Because the jury returned

a guilty verdict on the felony murder charge, it necessarily rejected the defense theory that Mena's act of running in front of the car was a superseding cause that should relieve Arroyo of liability. Indeed, Arroyo's participation in the violent armed robbery (as the person luring Edwards out of the apartment and serving as the getaway driver) foreseeably led to Edwards' girlfriend Mena trying to stop from fleeing the men who had just pistol-whipped her boyfriend. No reasonable juror could have determined that Mena's actions were an independent supervening cause of her death, such that Arroyo did not "cause" Mena's death by running her over.

Thus, we conclude that the instructional error was harmless beyond a reasonable doubt.

## II. *There Was Sufficient Evidence of Attempted Robbery*

In one single paragraph at the end of Arroyo's opening brief, Arroyo contends there is insufficient evidence to support his conviction for attempted robbery. He argues that "[n]o evidence was presented to show that the defendant had been with the two robbers before the robbery." In support of his argument, Arroyo cites neither to the record nor to any legal authority.

"[W]hen a criminal defendant claims insufficiency of the evidence on a particular element of the crime of which he was convicted, we presume the evidence of that element was sufficient, and the defendant bears the burden of convincing us otherwise." (*People v. Battle* (2011) 198 Cal.App.4th 50, 62.) Providing only "[a] brief, conclusory allegation" with no "substantial argument or citation to authority" to support a defendant's contention "constitutes a waiver of the point on appeal." (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1364, fn. 6; see *Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428,

1458 [" 'Mere suggestions of error without supporting argument or authority . . . do not properly present grounds for appellate review.' [Citation.] 'Hence, conclusory claims of error will fail.' "]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [When a point is asserted without argument and authority for the proposition, " 'it is deemed to be without foundation and requires no discussion by the reviewing court.' "].) Accordingly, we treat as forfeited Arroyo's claim of insufficiency of the evidence for the attempted robbery conviction.

### *DISPOSITION*

The judgment is affirmed.

STONE, J.

We concur:

MARTINEZ, P. J.

SEGAL, J.